STATE OF CONNECTICUT *v.* MICHAEL COCHRAN
(10018)

SPEZIALE, C. J., PETERS, HEALEY, SHEA and GRILLO, Js.

Argued May 5—decision released August 16, 1983

*David F. Egan,* public defender, with whom, on the brief, was *E. Eugene Spear,* public defender, for the appellant (defendant).

*John M. Massameno,* assistant state's attorney, with whom, on the brief, were *John J. Kelly,* state's attorney, and *Douglas Karp,* special deputy assistant state's attorney, for the appellee (state).

GRILLO, J. By a two count information, dated July 13, 1979, the defendant was charged with the crimes of burglary in the third degree; General Statutes § 53a-103 (a);[1] and larceny in the second degree. General Statutes § 53a-123 (a) (2).[2] At the close of the state's evidence and again at the close of all evidence, the defendant moved for a judgment of acquittal as to

---

[1] General Statutes § 53a-103 (a) states: "BURGLARY IN THE THIRD DEGREE: CLASS D FELONY. (a) A person is guilty of burglary in the third degree when he enters or remains unlawfully in a building with intent to commit a crime therein."

[2] General Statutes (Rev. to 1981) § 53a-123 states: "LARCENY IN THE SECOND DEGREE: CLASS D FELONY. (a) A person is guilty of larceny in the second degree when: (1) The property consists of a motor vehicle, (2) the

each count. Both motions were denied by the court, and he was subsequently found guilty as charged by the jury. The defendant thereafter pleaded guilty to two counts of being a persistent felony offender; General Statutes § 53a-40; and was sentenced to five to ten years on each count, to run concurrently, for an effective total sentence of five to ten years. From this judgment the defendant appeals.

The defendant presents the following issues: (1) whether the defendant, who was an invited guest in one portion of a single family house, could be found guilty of burglarizing a bedroom within that structure; (2) whether the trial court erred in its instructions to the jury on the definition of "building" as that term is used in General Statutes § 53a-103; (3) whether the evidence of value was sufficient to support a conviction of larceny in the second degree; and (4) whether the trial court erred in its supplemental instructions to the jury regarding the definition of market value.

The following facts could reasonably have been found by the jury: On March 6 and 7, 1979, a one-family, two bedroom house on 41 Deerfield Avenue in Milford was occupied by four people, including Diane Boxwell, the defendant's niece. Boxwell and her daughter occupied the living room, Sherri Williams occupied one bedroom and Heidi Williams occupied the second bedroom. Although the front door to the house did not lock, the individual bedrooms were equipped with chain bolt locks on the doors.

value of the property or service exceeds five hundred dollars, or (3) the property, regardless of its nature or value, is taken from the person of another.

"(b) Larceny in the second degree is a class D felony."

We note that § 53a-123 has been amended, inter alia, to increase the value of property or service pursuant to subsection (a) (2) from five hundred to five thousand dollars. Public Acts 1982, No. 82-271.

On March 6, 1979, between 5 and 7 p.m., Sherri Williams left the house after locking her bedroom door. It was her practice to keep the door locked, as her room contained numerous valuables, including a stereo system. She gave no one permission to enter her bedroom on March 6 or 7, 1979.

Boxwell invited the defendant to the Deerfield Avenue house on March 6, 1979. He arrived at approximately 8:30 p.m. and remained there overnight, sleeping on a living room couch. The following morning Boxwell left for work at approximately 7 a.m., leaving her uncle at the residence. She had checked the bedroom doors to verify that they were locked.

Sherri Williams returned home at approximately 2:30 p.m. on March 7, 1979. She found her bedroom door open and the contents of her room in disarray. Her stereo system, which included two speakers, a turntable with cartridge and a receiver, was gone. Additionally, a roll of ten one dollar bills was missing from her bookshelf. None of the missing items was returned or found.

Julie Sweeton, who is also the defendant's niece, and Sherri Urabel arrived at 41 Deerfield Avenue at approximately 12:15 p.m. on March 7, 1979. They had planned to take the defendant out to lunch. Each testified that upon arrival they viewed the defendant loading stereo speakers into a waiting taxi cab. The turntable and receiver were visible on the rear seat of the taxi. The defendant left in the taxi after failing to respond to Sweeton's inquiry as to what he was doing. Subsequently, Sweeton entered the house and noticed that Sherri Williams' bedroom door was open and that her stereo was missing.

In this appeal the defendant does not contest the sufficiency of the evidence regarding his wrongful

appropriation of the missing property, but asserts that an essential element of each of the crimes, as charged, has not been sufficiently established. Additionally, he alleges error in the trial court's charge to the jury relative to each of these disputed elements. We first consider the defendant's claims relating to the burglary conviction.

The defendant contends that the language of General Statutes § 53a-100,[3] read in conjunction with § 53a-103 (a),[4] exculpates him under the facts of this case. Succinctly stated, it is his position that having been invited by his niece to be inside the premises at 41 Deerfield Avenue, his appropriation of the missing property from the bedroom of Sherri Williams cannot constitute an entering or remaining unlawfully "in a building." Although candidly admitting that "[i]t was certainly a crime for the defendant to enter her room and steal the stereo equipment," the defendant nonetheless asserts that the bedroom was not a separate "building" within the meaning of that term and that

---

[3] "[General Statutes] Sec. 53a-100. DEFINITIONS. (a) The following definitions are applicable to this part: (1) 'Building' in addition to its ordinary meaning, includes any watercraft, aircraft, trailer, sleeping car, railroad car, other structure or vehicle or any building with a valid certificate of occupancy. Where a building consists of separate units, such as, but not limited to separate apartments, offices or rented rooms, any unit not occupied by the actor is, in addition to being a part of such building, a separate building; (2) 'dwelling' means a building which is usually occupied by a person lodging therein at night, whether or not a person is actually present; (3) 'night' means the period between thirty minutes after sunset and thirty minutes before sunrise.

"(b) The following definition is applicable to sections 53a-101 to 53a-106, inclusive: A person 'enters or remains unlawfully' in or upon premises when the premises, at the time of such entry or remaining, are not open to the public and when the actor is not otherwise licensed or privileged to do so."

[4] "[General Statutes] Sec. 53a-103. BURGLARY IN THE THIRD DEGREE: CLASS D FELONY. (a) A person is guilty of burglary in the third degree when he enters or remains unlawfully in a building with intent to commit a crime therein."

therefore his actions were "more properly a larceny in conjunction with some type of criminal trespass or criminal mischief." We disagree.

We begin our analysis by noting the definition of "building" as stated within General Statutes § 53a-100. Under this section, "building" is defined, inter alia, as follows: "Where a building consists of separate units, such as, *but not limited to* separate apartments, offices, or rented rooms, any unit not occupied by the actor is, in addition to being a part of such building, a separate building . . . ." (Emphasis added.) In light of this definition, we are satisfied that the subordinate facts recited above justify the conclusion that Sherri Williams' bedroom was a "building" within the meaning of General Statutes § 53a-103.[5]

The testimony establishes the fact that three individuals (as well as one of the tenant's children) occupied distinct parts of a building originally constructed as a one-family residence. Although the defendant was invited within 41 Deerfield Avenue, it is clear that his "invitation" was never expressly or impliedly extended to either of the bedrooms, which were locked. Indeed, Diane Boxwell testified that she had specifically "checked all the doors" to ensure that they were locked prior to leaving for work on the morning of March 7, 1979. Nor does the defendant's reliance upon the legislative history of § 53a-103 support his claim. It is clear that one purpose behind the enactment of our present burglary statutes was protection against intrusions likely to terrorize occupants. *State* v. *Belton,* 190 Conn. 496, 506, 461 A.2d 973 (1983). The defend-

---

[5] Relying on the principle of ejusdem generis, the defendant asserts that the various examples of "separate units" contained within General Statutes § 53a-100 (a) (1) support his claim that a bedroom within a single family residence cannot constitute a "building." This argument loses sight of the fact that the delineation of examples of "separate units" within § 53a-100 (a) (1) is expressly "not limited to" the several examples provided.

ant, noting that Williams knew of his presence within the house on the evening of March 6, 1979, claims that the potential for terror was lacking under these circumstances. Can it be disputed that the defendant's actions would have terrorized Williams if she had been in her room at the time of the break-in? The defendant's argument is baseless, and his actions were just the type of activity against which the burglary statutes were designed to protect.[6]

The defendant, while conceding that the court defined "building" in the words of the statute, took exception to the court's charge with respect to that definition. Specifically, he claims error by the trial court in its charge that "[w]hen a building consists of two or more units separately secured or occupied, any one of these units, when intruded upon . . . may be considered as

---

[6] The defendant cites numerous cases from other jurisdictions which he avers stand for the principle that a person on premises with consent cannot be convicted of burglary. These cases, however, are distinguishable from the factual situation presently before us. They stand for the general proposition, with which we do not quarrel, that a person who has permission, license or authorization to enter a particular area cannot be found guilty of burglary therein. E.g., *People* v. *Woods,* 182 Colo. 3, 5, 510 P.2d 435 (1973); *People* v. *Carstensen,* 161 Colo. 249, 250, 420 P.2d 820 (1966); *State* v. *Thibeault,* 402 A.2d 445, 448–49 (Me. 1979). By urging a rigid application of this general rule, the defendant effectively seeks this court to adopt a per se rule to the effect that one who obtains consent to enter a portion of a single family home can never be guilty of burglary with respect to a different section therein. We will not subscribe to such a blanket construction of the term "building," which decimates the purpose of the burglary statutes and which ignores the myriad of factual circumstances under which a burglary may occur.

We caution, however, that our conclusion should not be construed as a relaxation of the requirement that an actor must enter or remain "unlawfully in a building." Where, as here, the state seeks a burglary conviction based upon unlawful entry of a separate unit within a structure, its burden includes a sufficient showing that any license or privilege to remain in one section of the structure did not extend to the separate unit wherein the burglary allegedly occurred. We hold only that this burden was satisfied in the present case.

a separate building."[7] The defendant argues that the jury could well have concluded that the bedroom was a "building" only because it was "separately secured or occupied."

When considered in its entirety, the charge adequately explained the meaning of a "building." See *Kelly* v. *Bliss,* 160 Conn. 128, 132–33, 273 A.2d 873 (1970). " 'The charge to the jury . . . must be read as a whole, and an attempt to assert reversible error by culling a single phrase or inaccurate statement must fail unless it is reasonably probable that the jury were misled.' " *State* v. *Turcio,* 178 Conn. 116, 122, 422 A.2d 749 (1979). Moreover, even if we assume, for the sake of argument, that the court erred by including the "secured or occupied" language within its charge, this error heightened the evidentiary plateau necessary for

---

[7] In reference to the definition of the term "building," the trial court charged as follows:

"Burglary is an intrusionary offense. It cannot exist without the element of intrusion and that intrusion must be in what the law calls a building.

"Not everything that is built is a building. Ordinarily, and especially in connection with the crime you are considering, that word implies a structure which may be entered and used by human beings, whether or not actually so entered and used as a dwelling, or for business or for other purposes involving occupancy by people.

"The law, however, has broadened this definition to include, in addition to what we usually know as a building, a watercraft, aircraft, trailer, sleeping car, railroad car, or other structure or vehicle.

"One other consideration must also be mentioned in this connection. When a building consists of two or more units separately secured or occupied, any one of these units, when intruded upon within the reach of the law we are now considering, may be considered as a separate building. By the same token, however, the whole building is considered nonetheless a building for the purposes of unlawful intrusion.

"So, once again, if a building, or a building is defined as follows: A building, in addition to its ordinary meaning, includes any watercraft, aircraft, trailer, sleeping car, railroad car, or other structure or vehicle. Where a building consists of separate units such as, but not limited to, separate apartments, offices or rented rooms, any unit not occupied by the actor is, in addition to being part of such building, a separate building."

conviction. Any such error "was favorable to the defendant and is therefore not a justifiable basis of complaint by him." *Burton* v. *Burton,* 189 Conn. 129, 137, 454 A.2d 1282 (1983); see *State* v. *Hawthorne,* 175 Conn. 569, 574, 402 A.2d 759 (1978). We conclude that the defendant has failed to satisfy his burden of showing that the trial court's charge defining "building" was probably harmful to him. See *State* v. *Vennard,* 159 Conn. 385, 393–94, 270 A.2d 837 (1970), cert. denied, 400 U.S. 1011, 91 S. Ct. 576, 27 L. Ed. 2d 625 (1971).

With respect to his conviction of larceny in the second degree in violation of § 53a-123 (a) (2) of the General Statutes, the defendant contends that the evidence presented at trial was insufficient to establish a larceny of property with a value in excess of $500. Conceding that there was sufficient evidence of his wrongful appropriation of the ten one dollar bills, the defendant avers that the jury could not reasonably have found the value of Williams' stereo system to be at least $490. We agree.

The evidence presented concerning valuation of the stereo system is as follows: Sherri Williams testified that she purchased the system as a package in May, 1978, or approximately ten months prior to the alleged larceny. She recalled paying "around 550 dollars" for all of the components, which figure included the applicable sales tax paid thereon. She used the system daily prior to its appropriation and on one occasion had it repaired. Although Williams characterized the set as in "excellent condition" in March of 1979, she offered no opinion as to its value immediately before it was taken.

The state introduced as an expert witness Fred Thompson, an assistant sales manager at a stereo store which sold all of the components which comprised Williams' stereo system. He testified that the system could have been purchased as a "package deal" in May, 1978 for $485, excluding sales tax. He further testified that the same system sold as a package for $505 in March of 1979, again excluding sales tax.[8] Thompson stated that in his opinion the use of the stereo for the ten month period between May, 1978 and March, 1979 would result in depreciation of between 5 and 10 percent. On cross-examination, however, Thompson admitted to having "no idea" what the exact amount of depreciation would be without evaluating the system itself.[9] He conceded only that the value of the system would be worth something less than the original purchase price.

---

[8] Including sales tax, the purchase price of the system, in May of 1978 and March of 1979, respectively, was $518.95 and $540.35.

Thompson testified that the total "list price" of the sound system was $545 in May of 1978 and $560 in March of 1979. He defined "list price" as the manufacturer's suggested retail price on each separate component of the stereo system. Thompson made it clear, however, that "discounting" from the "list price" was very common, and that selling various components in a "package deal" further lowered the selling price of a stereo system. Thus, although the "list price" of the individual components totaled $545 and $560 in May of 1978 and March of 1979, Thompson stated that the price at which he sold a system containing the components of Williams' stereo, on a package basis, was $485 and $505 in May of 1978 and March of 1979, respectively.

[9] In response to defense counsel's question as to the value of Williams' stereo on March 7, 1979, Thompson stated:

"A. Well, we spoke earlier of depreciation, you know, if the gear still existed and were to be put on the market there probably would be some depreciation. So it would not be worth four hundred eight-five dollars.

"Q. What would it be worth?

"A. I have no idea. There is not really a very positive way of ascertaining that without the gear, without having someone evaluate it.

"Q. Well, wouldn't it depreciate at least by ten percent?

"A. I would say roughly somewhere in that ballpark."

The defendant offered the testimony of Leonard Fortgang, a public fire adjuster, on the issue of value. Although he offered no opinion as to the value of Williams' stereo system, in his opinion the value of the equipment would have decreased during the ten month period between May, 1978 and March, 1979. Depreciation during this period, according to Fortgang, would have been "at least" 10 percent, and perhaps as much as 15 to 20 percent depending upon the condition of the system.

Pursuant to General Statutes § 53a-121, "value means the market value of the property . . . at the time and place of the crime or, if such cannot be satisfactorily ascertained, the cost of replacement of the property . . . within a reasonable time after the crime." Clearly, therefore, value is defined, first, in terms of "market value," and only if such cannot be satisfactorily ascertained should the jury consider "replacement cost." We have defined market value as " 'the price that would in all probability—the probability being based upon the evidence in the case—result from fair negotiations, where the seller is willing to sell and the buyer desires to buy.' " *O'Brien* v. *Board of Tax Review,* 169 Conn. 129, 138, 362 A.2d 914 (1975).

Where, as here, value constitutes an element of the crime as charged, we must determine " 'whether the jury could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond reasonable doubt.' " *State* v. *Johnson,* 188 Conn. 515, 529, 450 A.2d 361 (1982); see *State* v. *Baker,* 182 Conn. 52, 62, 437 A.2d 843 (1980). Giving the evidence the most favorable construction toward sustaining the jury's verdict; *State* v. *Johnson,* supra; and recognizing that it is the function of the trier to assess the

credibility and weight of the evidence presented; *State v. Avcollie,* 178 Conn. 450, 457, 423 A.2d 118 (1979), cert. denied, 444 U.S. 1015, 100 S. Ct. 667, 62 L. Ed. 2d 645 (1980); we are nevertheless unable to determine that the jury could reasonably have concluded that the market value of the stereo system was in excess of $490.

Although Sherri Williams testified that she purchased the stereo for "around 550 dollars" in March of 1978, this figure included the sales tax paid thereon.[10] Moreover, although market value is to be ascertained "at the time and place of the crime"; General Statutes § 53a-121; she offered no opinion as to the value of the set on the date of its appropriation. "Whether an owner's testimony as to the *current* market value provides sufficient information to support a jury verdict depends on the circumstances of each case." (Emphasis added.) *State* v. *Baker,* supra, 63. In light of the factors delineated above, Williams' testimony provides an insufficient basis for reasonable jurors to ascertain, beyond a reasonable doubt, that the market value of the stolen stereo exceeded $490.

Nor can we conclude that the testimony of the experts provided a sufficient basis for a finding of market value in excess of $490. Although Thompson testified that a new system would sell for $505 in March of 1979, the same system sold for $485 in May, 1978. It was undisputed that the value of the system would depreciate during the ten month period between Williams' purchase and the appropriation of the system, although the amount of such depreciation was in dispute. Even assuming de minimis depreciation, therefore, the maximum market value of the system cannot reasonably be ascertained as in excess of $490.

---

[10] The parties agree that sales tax is not a component of market value. In May of 1978, Connecticut's sales tax was 7 percent.

Because there was insufficient evidence as a matter of law to conclude that the market value of the stolen property exceeded $500, the trial court erred in submitting that basis for rendering a verdict of larceny in the second degree to the jury. Even if we assume, for the sake of argument, that the evidence concerning replacement cost was sufficient to establish a value of the stereo in excess of $490, we cannot discern from the record before us whether the jury utilized that method for determining valuation. Thus the jury may have predicated its verdict on a standard which we have found to be deficient. "In these circumstances we think the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *Yates* v. *United States,* 354 U.S. 298, 312, 77 S. Ct. 1064, 1 L. Ed. 2d 1356 (1957). The conviction of larceny in the second degree must be set aside.

Although the verdict on the charge of second degree larceny must be set aside since there was the possibility that the conclusion of the jury lacked a clearly valid evidential basis, the lesser included offense of larceny in the third degree[11] was not subject to that debility. If we construe the evidence presented in a manner most favorable to the defendant, i.e., a purchase price of $485 for stereo equipment in May, 1978, coupled with a depreciation factor of 20 percent, the market value of the system nevertheless stands at $388. Regarding replacement cost, the purchase of an identical system in March, 1979 for $505, minus 20 percent applicable to depreciation, would result in a value of $404. Thus the only reasonable construction of the evidence pre-

[11] General Statutes (Rev. to 1981) § 53a-124 states in pertinent part: "LARCENY IN THE THIRD DEGREE: CLASS B MISDEMEANOR. (a) A person is guilty of larceny in the third degree when: (1) The value of the property . . . exceeds fifty dollars . . . ."

sented results in a value far in excess of $50 under both the market value and replacement cost approaches.

In this case, the trial court instructed the jury on the lesser included offense of larceny in the third degree, and the defendant does not claim error with respect to that charge. " 'Since the jury could have explicitly returned such a verdict, the defendant was well aware of [his] potential liability for this crime and would not now be prejudiced by modification of the judgment rendered on the verdict consistent with the above.' " *State* v. *Scielzo,* 190 Conn. 191, 205, 460 A.2d 951 (1983).

In light of our conclusion concerning the verdict of larceny in the second degree, we need not reach the defendant's final assignment of error.

There is error with respect to the conviction of larceny in the second degree. The case is remanded for modification of that judgment in accordance with this opinion and for resentencing on the lesser included offense of larceny in the third degree as that statute existed at the time the defendant was arrested and charged in this case.[12]

In this opinion the other judges concurred.

---

[12] Because one count of the defendant's conviction as a persistent felony offender was premised upon his conviction of the felony of larceny in the second degree, that conviction will have to be set aside, as the state concedes.