STATE OF CONNECTICUT *v.*
VINCENTE G. MOROCHO
(AC 23982)

Schaller, Dranginis and Gruendel, Js.

Argued October 25, 2005—officially released January 17, 2006

*Kent Drager*, senior assistant public defender, with whom, on the brief, was *James F. Longwell*, deputy assistant public defender, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *Paul J. Ferencek*, senior assistant state's attorney, for the appellee (state).

*Opinion*

DRANGINIS, J. The defendant, Vincente G. Morocho, appeals from the judgment of conviction, rendered after a jury trial, of attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-70 (a) (1), and burglary in the second

degree in violation of General Statutes § 53a-102 (a) (1). On appeal, the defendant claims that (1) there was insufficient evidence to support the conviction of (a) attempt to commit sexual assault in the first degree and (b) burglary in the second degree, and (2) the court abused its discretion by (a) permitting the victim to testify as to her perception of what the defendant tried to do to her and (b) limiting his cross-examination of the victim. We disagree and therefore affirm the judgment of the trial court.

The jury reasonably could have found the following facts.[1] In September, 2001, the victim[2] moved into a two bedroom, basement apartment in Stamford that was leased to Cumanda Segarra and her husband, the defendant. The victim was acquainted with Segarra through their place of employment. The victim paid the couple $350 in rent monthly. The victim slept in one bedroom, and the defendant slept with his wife in the other. In January, 2002, the defendant and Segarra moved to a second and third floor apartment in the building because the basement apartment violated the building code. At the time of the move, the victim arranged with the landlord to lease directly from him the bedroom she had been using for $300 a month, as long as she did not use the kitchen. The victim intended to rent the bedroom until March, 2002, when she expected her boyfriend to move to Stamford, where the two of them would rent a larger apartment.[3] Although the defendant and Segarra had moved out of the basement, they retained a key and had the landlord's permission to enter the basement. Segarra visited the victim in the basement, as they remained on friendly terms.

[1] A number of witnesses, including the victim, testified with the aid of a foreign language interpreter.

[2] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[3] At the time of trial, the victim had married her boyfriend. See part II B.

On the evening of February 2, 2002, at approximately 8 p.m., the defendant took Segarra to the home of a friend and went to a social club where he met several of his friends, played pool and cards and consumed beer. At about 2 a.m., the defendant and one of his friends, Gilbert Aladivar, called for Segarra, and the three of them returned to the second and third floor apartment. The defendant brought a case of beer with him. While Segarra went to sleep on the third floor, the defendant and Aladivar sat drinking beer at the kitchen table on the second floor. Segarra returned to the kitchen twice. She came down at 3:30 a.m. to advise the defendant and Aladivar not to make noise because people were sleeping in the building. She came down again at 5 a.m. and found Aladivar sleeping and the defendant drinking beer. Segarra invited Aladivar to sleep in the basement, but he elected to go home. Segarra told her husband to go to bed because it was too early to be drinking. The defendant took the case of beer, however, and went downstairs. Shortly thereafter, the victim appeared in Segarra's apartment. Segarra then went down to the basement and saw the defendant standing there with a bottle of beer.

On the night in question, the victim, after visiting with family, retired at about midnight, after locking the front and rear doors to the basement apartment and closing the door to her bedroom, which did not lock from the inside. At approximately 5:30 a.m., the victim was awakened by the smell of cigarette smoke. She looked up and saw a black shadow in the doorway. She raised herself and asked the person to identify himself. She asked the question repeatedly. The person, a man, did not answer. According to the victim, the man "charged" toward her and attempted to kiss her and take away her blanket. The man got on top of her while she was in her bed. The two were tugging at the blanket, and the victim kicked the man and pulled his hair. She

smelled alcohol on the man. The man tried to touch her all over her body. The victim eventually broke away and turned on a light. The victim then looked at the man who was lying on her bed and recognized him as being the defendant. The defendant was laughing, but the victim was angry because of the defendant's behavior and the fact that the two of them were acquainted. The victim then insulted the defendant, took her telephone and left the bedroom. She went into the kitchen and telephoned her male cousin. Then she went upstairs to Segarra and told her what had happened. Segarra, in response, went downstairs to look for the defendant. The victim went outside to wait for her cousin.

When the victim's cousin arrived, she told him what had happened, and the two of them went to look for the defendant and Segarra. The four encountered one another in a hallway. The defendant behaved aggressively and asked the victim, "Did I make love to you? Did I make love to you? You fucking bitch. What did I do? What did I do?" The victim insulted the defendant.[4] The defendant and Segarra went to their apartment, and the victim and her cousin entered her bedroom. The victim telephoned the landlord, and her cousin telephoned the victim's brother. At that point, the victim noticed a bottle of beer on the floor and cigarette ashes in the kitchen sink.

When the victim's brother arrived, the victim informed him of the circumstances. Her cousin and brother went upstairs and confronted the defendant. The victim thereafter heard a commotion and went upstairs to discover her brother bleeding and lying on the floor. The defendant and the victim's cousin were being restrained by others who had responded to the commotion. The victim and her relatives retreated to the basement and telephoned the police. The victim

---

[4] The victim stated to the defendant: "Bastard. You're not a man."

gave a statement to the police officers who had responded to the scene. Additional facts will be set forth as necessary.

I

The defendant claims that there is insufficient evidence to support the conviction of attempt to commit sexual assault in the first degree and burglary in the second degree. We do not agree.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 270, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005). "In conducting our review, we are mindful that the finding of facts, the gauging of witness credibility and the choosing among competing inferences are functions within the exclusive province of the jury, and, therefore, we must afford those determinations great deference." *State* v. *Conde*, 67 Conn. App. 474, 490, 787 A.2d 571 (2001), cert. denied, 259 Conn. 927, 793 A.2d 251 (2002).

"[P]roof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that

would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Merriam*, 264 Conn. 617, 629, 835 A.2d 895 (2003).

A

The defendant's first claim of insufficient evidence concerns his conviction of attempt to commit sexual assault in the first degree in violation of §§ 53a-49 (a) (2)[5] and 53a-70 (a) (1).[6] More specifically, the defendant contends that his behavior, as he characterizes it, before he stopped and laughed, was insufficient to prove beyond a reasonable doubt that he acted with the specific intent to use physical force to compel the victim to engage in sexual intercourse rather than, for example, the less culpable and uncharged crime of intent to

[5] General Statutes § 53a-49 provides in relevant part: "(a) A person is guilty of attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

"(b) Conduct shall not be held to constitute a substantial step under subdivision (2) of subsection (a) . . . unless it is strongly corroborative of the actor's criminal purpose. . . ."

[6] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

subject her to sexual contact.[7] He also claims that the evidence produced by the state was insufficient to prove that he had taken a substantial step that was strongly corroborative of the required mental state pursuant to § 53a-49 (b). The defendant's claim lacks merit.

To convict a defendant of attempt to commit sexual assault in the first degree, "the state must have proven beyond a reasonable doubt that the defendant acted with the specific intent to commit sexual assault in the first degree which in turn included the intent to have *sexual intercourse* . . . and that the defendant took a substantial step in a course of conduct planned to culminate in his commission of the crime." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Milardo*, 224 Conn. 397, 403, 618 A.2d 1347 (1993).

The defendant relies on *Milardo* to support his claim of insufficient evidence as to his intent to have sexual intercourse with the victim. In *Milardo*, the defendant entered the house where the victim, a college student, resided with others. Id., 401. The victim was in her bed when the defendant opened the door and inquired as to the whereabouts of one of the victim's housemates. Id. When he learned that no one else was at home, he went to the victim's bed, pulled off the covers, lay on top of her, put his hands under her clothing and touched her breasts and vagina. Id., 404. The sexual assault was ended when one of the victim's friends came home, heard the victim's muffled screams and entered the bedroom. Id., 401. Our Supreme Court concluded that the jury reasonably could have inferred that the defendant intended to have sexual intercourse with the victim. Id., 405.

---

[7] The defendant also argued that there was insufficient evidence to prove that he had the noncriminal intent of drunkenly trying to kiss or to seduce the victim.

The defendant argues that the facts of *Milardo* are distinguishable from those at issue here and that there was insufficient evidence to permit the jury to infer without speculating that he intended to have sexual intercourse with the victim, rather than mere sexual contact. He distinguishes *Milardo* factually because unlike the defendant in that case, he did not put his hands under the victim's nightclothes or touch her vagina. The victim in this case testified, however, that the defendant tried to hold her hands, attempted to kiss her and touch her all over her body. Second, we know of no law, and the defendant has not cited any, that the intent to have sexual intercourse is determined by whether the assailant reaches under the victim's clothing. We agree that the facts of the two cases are different but conclude that the distinction does not alter the outcome. The sexual assault in *Milardo* ceased when the victim's friend entered the room and interrupted it. Here, the victim fought off the defendant by kicking, scratching and pulling his hair. She interrupted the defendant's sexual assault by breaking free of him. In both *Milardo* and this case, the sexual assaults were ended, not by the perpetrator who ceased his advances of his own accord, but by a force external to him.

"Intent may be inferred from the conduct of the accused. . . . The intent of the actor is an issue to be determined by the trier of fact. . . . Likewise, what constitutes a substantial step in any given case is a matter of degree and a question of fact for the jury. . . . The substantial step must be at least the start of a line of conduct which will lead naturally to the commission of a crime which appears to the actor at least to be possible of commission by the means adopted." (Citations omitted; internal quotation marks omitted.) Id., 403–404.

In this case, the jury heard evidence that the defendant refused to identify himself to the victim when she

asked who was standing at the door of her darkened room at 5 a.m. The defendant "charged" toward the victim, attempted to remove her blanket, to hold her hands and to touch her all over her body. He also tried to kiss her. The jury reasonably could have found, on the basis of the evidence, that the defendant intended to compel the victim to engage in sexual intercourse if she had not been able to fight him off. The jury also reasonably could have found that the defendant had taken a substantial step toward the commission of the crime of sexual assault in the first degree and that that specific step evinced his specific intent to commit that crime.

As our Supreme Court stated in *Milardo*, "even if a jury could infer from a given set of facts that a defendant might have intended to commit a crime other than that charged, the jury is not precluded from reasonably finding that he intended to commit the crime with which he was charged." *State* v. *Milardo*, supra, 224 Conn. 405. That statement addresses the defendant's claim that there was insufficient evidence for the jury to find that he intended to commit sexual assault in the first degree rather than just to have sexual contact with the victim. "Because not every person who commits sexual assault has intercourse as their ultimate objective, the legislature in the penal code has distinguished between sexual assault with sexual intercourse as its goal and sexual assault with sexual contact as its goal." Id. Even though the jury could have found that the defendant had intended to compel only sexual contact, the jury could also reasonably have inferred that the defendant intended to compel the victim to engage in sexual intercourse. See id.

We also disagree with the defendant's argument that there was insufficient evidence to prove that he had taken a substantial step that was strongly corroborative of the mental state to have sexual intercourse with the

victim. "To constitute a substantial step, the conduct must be strongly corroborative of the actor's criminal purpose. . . . This standard focuses on what the actor has already done and not what remains to be done." (Citation omitted; internal quotation marks omitted.) *State* v. *Hanks*, 39 Conn. App. 333, 341, 665 A.2d 102, cert. denied, 235 Conn. 926, 666 A.2d 1187 (1995). "The substantial step must be at least the start of a line of conduct which will lead naturally to the commission of a crime . . . ." (Internal quotation marks omitted.) *State* v. *Osborn*, 41 Conn. App. 287, 294, 676 A.2d 399 (1996).

We conclude, on the basis of the evidence, that it was well within reason for the jury to conclude that the defendant intended to have sexual intercourse with the victim. The jury reasonably may have inferred, on the basis of its everyday experience and the evidence presented, that by entering the victim's bedroom and lying on top of her while attempting to kiss her and touch her all over her body, the defendant took a substantial step in a line of conduct that would culminate in sexual intercourse. See *State* v. *Reyes*, 19 Conn. App. 179, 191, 562 A.2d 27 (1989) ("trier may rely on its common sense, experience and knowledge of human nature in deciding among conflicting inferences that logically and reasonably flow from the same basic fact"), cert. denied, 213 Conn. 812, 568 A.2d 796 (1990).

For the foregoing reasons, we conclude that there was sufficient evidence for the jury reasonably to find that the defendant intended to engage in sexual intercourse with the victim and that he took a substantial step toward the commission of that crime.

B

The defendant also claims that there was insufficient evidence to convict him of burglary in the second degree

in violation of § 53a-102 (a) (1).[8] In particular, the defendant contends that there was insufficient evidence to prove beyond a reasonable doubt that he unlawfully entered or that he unlawfully remained in the victim's bedroom because the state failed to prove that he was not licensed or privileged to enter or remain in the basement.[9] The defendant's claim fails regardless of whether he had a license to enter the basement because under no circumstances did he have the right to enter or remain in the victim's bedroom to commit a crime.

The substitute information dated October 23, 2002, alleges in the second count: "AND SAID STATE'S ATTORNEY FURTHER ACCUSES the [defendant] with the crime of BURGLARY IN THE SECOND DEGREE and charges that at the City of Stamford on or about the 2nd day of February, 2002, the [defendant] did enter and remain unlawfully in the building of [the victim] at night with intent to commit a crime therein, in violation of Section 53a-102 (a) of the Connecticut General Statutes."

It is not disputed that the defendant and Segarra leased the basement apartment until a building code violation required them to move to the second and third floor apartment and that they retained a key to the basement apartment.[10] It also is undisputed that after the defendant moved upstairs, the landlord leased to the victim the bedroom in the basement that she formerly had rented from the defendant and Segarra. On the night in question, the victim locked the doors to

---

[8] General Statutes § 53a-102 (a) provides in relevant part: "A person is guilty of burglary in the second degree when such person (1) enters or remains unlawfully in a dwelling at night with intent to commit a crime therein . . . ."

[9] The defendant concedes that the incident occurred in a dwelling and at night.

[10] The landlord also testified on behalf of the defendant that he had given him permission to continue to enter the basement.

the basement apartment and closed the door to her bedroom.

"A person is guilty of burglary in the second degree when such person . . . enters or remains unlawfully in a dwelling at night with intent to commit a crime therein . . . ." General Statutes § 53a-102 (a) (1). General Statutes § 53a-100 (a) provides in relevant part: "(1) . . . Where a building consists of separate units, such as, but not limited to separate apartments . . . or rented rooms, any unit not occupied by the actor is, in addition to being a part of such building, a separate building; (2) dwelling means a building which is usually occupied by a person lodging therein at night, whether or not a person is actually present . . . ." (Internal quotation marks omitted.) General Statutes § 53a-100 (b) provides in relevant part: "The following definition is applicable to sections 53a-101 to 53a-106, inclusive: A person enters or remains unlawfully in or upon premises when the premises, at the time of such entry or remaining, are not open to the public and when the actor is not otherwise licensed or privileged to do so." (Internal quotation marks omitted.)

The defendant argues that because the landlord permitted him to keep a key and to enter the basement, he had a license to enter it and could not be guilty of having committed burglary by entering a place where he was permitted to be. The state counters that the defendant did not have a license to enter the basement because the landlord had leased the space to the victim.[11] We need not consider whether the defendant had a license to enter the basement, as we resolve his claim

---

[11] Neither the defendant nor the state addressed the question of whether the victim's bedroom was a separate unit within the basement apartment. See General Statutes § 53a-100; *State* v. *Cochran*, 191 Conn. 180, 185, 463 A.2d 618 (1983) (guest's invitation to private home did not extend to locked bedrooms).

on the question of whether he remained unlawfully in the victim's bedroom.

"A person enters or remains unlawfully in or upon premises when the premises, at the time of such entry or remaining, are not open to the public and when the actor is not otherwise licensed or privileged to do so. . . . A *license* in real property is defined as a personal, revocable, and unassignable *privilege,* conferred either by writing or parol, to do one or more acts on land without possessing an interest therein. . . . Generally, a license to enter premises is revocable at any time by the licensor. . . . It is exercisable only *within the scope of the consent given.* . . . The phrase licensed or privileged, as used in General Statutes § 53a-100 (b) is meant as a unitary phrase, rather than as a reference to two separate concepts." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Allen,* 216 Conn. 367, 380, 579 A.2d 1066 (1990).

"The original and basic rationale of the crime [of burglary] is the protection against invasion of premises likely to terrorize occupants." (Internal quotation marks omitted.) *State* v. *Russell,* 22 Conn. App. 440, 445, 577 A.2d 1107 (1990), rev'd on other grounds, 218 Conn. 273, 588 A.2d 1376 (1991). According to the victim, she was awakened by the smell of cigarette smoke. She saw an unknown person standing in the open doorway to her bedroom. That unknown person, who refused to identify himself, entered the room by "charging" toward the victim and lying on top of her while he attempted to remove the blanket, to touch and to kiss her. The law recognizes that to be awakened in the dark and to see an unknown person standing at the door to one's bedroom may cause terror. Not only did the defendant open the door to the victim's bedroom, but also he failed to identify himself when the victim inquired. When an actor is licensed or privileged to be in a building, "the element of terror is missing and the requirement [for

burglary] is not met. This does not mean, however, that an initial lawful entry followed by an unlawful remaining would be excused. For example, A enters an office building during business hours—a lawful entry since the building is open to the public—and remains, perhaps hidden, after the building is closed, with intent to steal. A is guilty of burglary. . . . Commission to Revise the Criminal Statutes, Penal Code Comments, Connecticut General Statutes (1969) pp. 52–53." (Internal quotation marks omitted.) *State* v. *Thomas*, 210 Conn. 199, 207–208, 554 A.2d 1048 (1989).

In *Reyes*, this court concluded that an armed man's pointing of a gun implicitly withdrew the consent of an apartment dweller to remain in the residence where the man had been granted permission to enter. *State* v. *Reyes*, supra, 19 Conn. App. 190–92. In *Allen*, our Supreme Court concluded that the consent for the actor to enter a condominium was withdrawn when he saw "the victim naked, gagged, and tied up on the floor, and [saw his accomplice] threaten, strike and choke the victim while the victim, in terror, looked for help, all [of which were clear indications] to the defendant that, even if there were consent for his initially entering the condominium, it had been withdrawn." *State* v. *Allen*, supra, 216 Conn. 384. So too, in this case, whatever possible license the defendant thought he had to enter the victim's bedroom, an issue we have not decided, that license was withdrawn when he refused to identify himself, charged toward the victim, lay on top of her and attempted to kiss and to touch her all over her body. See *State* v. *Henry*, 90 Conn. App. 714, 726, 881 A.2d 442 ("even if one is lawfully admitted into a premises, the consent of the occupant may be implicitly withdrawn if the entrant terrorizes the occupants"), cert. denied, 276 Conn. 914, 888 A.2d 86 (2005).

We conclude, therefore, that there was sufficient evidence for the jury to infer from the facts presented that

the defendant remained unlawfully in the victim's bedroom.

## II

The defendant also claims that the court abused its discretion with respect to the evidence by (a) permitting the victim to testify as to her impression of what the defendant was trying to do to her and (b) limiting his cross-examination of the victim. We are not convinced.

Our Supreme Court has stated that "[i]t is a fundamental rule of appellate review of evidentiary rulings that if [the] error is not of constitutional dimensions, an appellant has the burden of establishing that there has been an erroneous ruling which was probably harmful to him. . . . Two lines of cases have developed setting forth the standard for reversing nonconstitutional, evidentiary improprieties. Under one line of cases, the defendant must establish, in order to obtain a reversal of his conviction, that it is more probable than not that the result of the trial would have been different if the error had not been committed. . . . According to the second line of cases, the defendant must show that the prejudice resulting from the impropriety was so substantial as to undermine confidence in the fairness of the verdict. . . . Under either formulation, [w]hether [the improper admission of a witness' testimony] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial. . . . If the evidence may

have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Citations omitted; internal quotation marks omitted.) *State* v. *Gonzalez*, 272 Conn. 515, 527–28, 864 A.2d 847 (2005).

## A

The defendant's first evidentiary claim is that the court improperly permitted the state to present evidence of the victim's opinion on the ultimate issue, which is a question for the jury to determine. In other words, the defendant claims that the victim improperly was permitted to testify that she thought that the defendant was going to rape her. We do not agree that the court abused its discretion by admitting the testimony.

The following facts are related to that claim. On direct examination, the victim explained what transpired when she was struggling with the defendant:

"[The Prosecutor]: All right. And as this struggle was happening in the bed, what did you believe this person was attempting to do?

"[Defense Counsel]: Objection, Your Honor, as to her belief.

"[The Prosecutor]: I think—I claim it, Your Honor. I think it's clearly relevant. He's on the bed with her, there's a struggle. She's able to testify to this. This is happening to her.

"The Court: What's the objection?

"[Defense Counsel]: Pardon me.

"The Court: What's the objection?

"[Defense Counsel]: What he was trying to do is a matter of inference the jury could draw from facts that she testifies to. She can't read anyone else's mind. And, her belief is simply not relevant or material.

"[The Prosecutor]: I claim it.

"The Court: I think the question can be answered in this way: What did it appear to you that this person was trying to do? . . .

"[The Victim]: He was trying to rape me.

"The Court: All right."

The victim also testified that she immediately told Segarra and then her cousin, her brother and the police what the defendant had done to her. The state called the victim's cousin, her brother and two Stamford police officers, George Salazar and Collin Morris, to testify. Both the victim's cousin and her brother testified that she told them that the defendant tried to rape her. Salazar testified that the victim was very upset when he saw her and that the nature of her complaint was of an attempted sexual assault. Morris testified that the victim told him that the defendant committed a sexual attack by entering her bedroom and jumping on her. The defendant did not object to the testimony of the witnesses who reported what the victim had reported to them, i.e., that the defendant had tried to rape her.

First, we must determine whether the defendant's claim is reviewable on appeal. The state argues that the claim is not reviewable because the defendant did not object on the grounds of lay opinion or that the testimony would embrace the ultimate question. Our review of the transcript discloses that although the objection was not articulated in terms of lay opinion or the ultimate question, defense counsel objected, stating that the testimony concerned an inference the jury could draw from the facts. The objection was sufficient to inform the court that the defendant was objecting to a question that sought the victim's opinion as to the ultimate question, which was a factual determination for the jury to decide. We disagree, however, that the

question to which the victim responded sought her opinion on the ultimate question.

We also must determine the standard of review to apply to the defendant's claim. The defendant contends that the abuse of discretion standard does not apply to this evidentiary claim. He argues that § 7-1[12] and § 7-3[13] of the Connecticut Code of Evidence prohibit the admission of opinion testimony by lay witnesses and opinion testimony on the ultimate issue, respectively, and therefore the plenary standard of review applies. "Because of the wide range of matters on which lay witnesses are permitted to give their opinion, the admissibility of such evidence rests in the sound discretion of the trial court, and the exercise of that discretion, unless abused, will not constitute reversible error." (Internal quotation marks omitted.) *State* v. *Finan*, 275 Conn. 60, 65–66, 881 A.2d 187 (2005).

"[T]he phrase ultimate issue is not amenable to easy definition. . . . As a rule, however, [t]estimony is objectionable if it embraces an opinion on the ultimate issue to be decided by the trier of fact. . . . It is improper for a witness to offer testimony that essentially constitutes a legal opinion about the guilt of the defendant." (Citations omitted; internal quotation marks omitted.) Id., 66. We disagree with the defendant's characterization of the victim's testimony as an opinion on the ultimate question. The court asked the victim to articulate *her perception* of what the defen-

[12] Connecticut Code of Evidence § 7-1 provides: "If a witness is not testifying as an expert, the witness may not testify in the form of an opinion, unless the opinion is *rationally based on the perception of the witness* and is helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue." (Emphasis added.)

[13] Connecticut Code of Evidence § 7-3 (a) provides in relevant part: "Testimony in the form of an opinion is inadmissible if it embraces an ultimate issue to be decided by the trier of fact, except that . . . an expert witness may give an opinion that embraces an ultimate issue where the trier of fact needs expert assistance in deciding the issue."

dant was doing.[14] The testimony, therefore, was admissible under § 7-1 to clarify her testimony regarding the events that occurred on her bed at 5 a.m. while the defendant was lying on top of her.[15] The testimony explains the victim's motivation to go upstairs to Segarra, telephone her cousin and the landlord, and to tell her brother what had transpired. It also explains why she insulted the defendant. We conclude, therefore, that the court did not abuse its discretion by permitting the state to elicit testimony from the victim as to her perception of what the defendant was trying to do.

Even if we had concluded that the court abused its discretion by admitting the victim's testimony, the evidence was cumulative and therefore harmless. The victim's cousin and her brother testified that shortly after the incident, the victim told them that the defendant had tried to rape her. The police officers described the nature of the victim's complaint as a sexual assault. The defendant did not object to their testimony. Before the victim's cousin, her brother and the police officers could testify as to the victim's report of sexual assault, it was necessary for the victim to testify as to the facts of the assault and the identity of the person or persons to whom she reported the incident. See *State* v. *Troupe*, 237 Conn. 284, 304–305, 677 A.2d 917 (1996) (en banc). Furthermore, "[i]t is well recognized that any error in the admission of evidence does not require reversal of the resulting judgment if the improperly admitted evidence is merely cumulative of other validly admitted testimony." (Internal quotation marks omitted.) *State* v. *Gonzalez*, supra, 272 Conn. 528–29; see also *State* v. *Cummings*, 91 Conn. App. 735, 746, 883 A.2d 803, cert.

---

[14] As a matter of contrast, the state noted in its brief that if the prosecutor had asked the victim what the defendant intended to do, that evidence would not have been admissible, as it is not possible to know another person's intent.

[15] We note that the defendant does not deny that he lay on top of the victim. He only challenges the jury's inference of his mental state at the time, i.e., what he intended to do.

denied, 276 Conn. 923, 888 A.2d 90 (2005); *State* v. *Rodriguez*, 91 Conn. App. 112, 122, 881 A.2d 371, cert. denied, 276 Conn. 909, 886 A.2d 423 (2005). For the foregoing reasons, the defendant's claim fails.

B

The defendant's second evidentiary claim is that the court deprived him of the right to confront the victim as to her bias and motive for making the type and degree of complaint she made. Specifically, the defendant claims that the court abused its discretion by sustaining the state's objection to his cross-examination of the victim with respect to her estrangement from the man who was the father of her children, her feelings toward male infidelity in a committed relationship and the impact the underlying facts had on the estrangement. We disagree with the claim.

The following facts are relevant to our review of the defendant's claim. At the time the victim moved into the apartment, she was not married, but she subsequently married. On cross-examination, defense counsel asked the victim whether there were problems in September, 2001, between the victim and the man who now is her husband. The state objected to the question on the ground of relevance. The court first excused the jury, then listened to the defendant's offer of proof and later sustained the state's objection.[16]

---

[16] The following colloquy transpired with respect to the objection:

"The Court: Okay. And there's a relevancy objection. What's the claim on it?

"[Defense Counsel]: Your Honor, my understanding is that [the victim] came to live with my client because she and her husband were having difficulties. He had left to go to Indiana because they were having some problems that were long-standing. I don't think we need to go into that, the reasons. But I think that her emotional condition and reaction to men—and in fact, I believe that's her husband seated there, although I may be wrong. I'm sure it's not a witness seated in the courtroom—may influence and color her testimony.

"[The Prosecutor]: I think it's just completely speculative. Because she's having some sort of problem with her current boyfriend that therefore that has some relevancy . . .

On appeal, the defendant argues that pursuant to the federal constitution, he is "entitled fairly and fully to confront and to cross-examine the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-

---

"The Court: Her current husband.

"[The Prosecutor]: . . . which turns out to be her current husband that somehow that would indicate that she fabricated this incident. I think it would just invite speculation. It has absolutely no relevancy.

"The Court: All right.

"[The Prosecutor]: Especially where counsel doesn't even plan on delving into the reason for the problem.

"The Court: All right. Do you still claim it?

"[Defense Counsel]: Your Honor, I'm not suggesting that the reason is necessary. My understanding from my client's wife, as to the basis of their difficulty was that it was—had to do with issues of infidelity and that these are issues that [the victim] is concerned with. And, also, accusing my client of such a thing with her best friend—with her best friend's husband, I think, provides a context.

"In addition to that, Your Honor, it wasn't just a boyfriend who later became her husband. My understanding is that they had a long-standing relationship and that they have children together, approximately age fourteen or thereabouts. I may be wrong about the age of the children. So, this was not a fly-by-night situation that later became solidified into a marriage. It was a disturbing and very sad time for [the victim].

"The Court: Okay. I just fail to see how her relationship with her then boyfriend, now husband, whether or not they had any problems, notwithstanding you're not going to ask what they were, how that is relevant at all. I'm going to sustain the objection.

"[The Prosecutor]: Thank you.

"[Defense Counsel]: Your Honor, I would just put one more thing on the record, which is the 'Pauline in peril syndrome,' needing to be rescued.

"[The Prosecutor]: Excuse me.

"The Court: The what? . . .

"[Defense Counsel]: On the train tracks. I guess I'm dating myself. But in any event, Your Honor, that the level of reaction and the fact that she was then able to resume her relationship with her husband very shortly thereafter as a result of her needing his guidance and protection is a motive for her, perhaps, viewing the situation in more dire circumstances than necessary. . . .

"The Court: I think it's irrelevant and speculative based upon the record before me. I'm sorry."

examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . . In order to comport with the constitutional standards embodied in the confrontation clause, the trial court must allow a defendant to expose to the jury facts from which the jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." (Citations omitted; internal quotation marks omitted.) *State* v. *Barnes*, 232 Conn. 740, 745–46, 657 A.2d 611 (1995).

We are, however, mindful that "[t]he confrontation clause does not . . . suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited through cross-examination. . . . The court determines whether the evidence sought on cross-examination is relevant by determining whether that evidence renders the existence of [other facts] either certain or more probable." (Citations omitted; internal quotation marks omitted.) Id., 746. "Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . [I]t is entirely proper for a court to deny a request to present certain testimony that will further nothing more than a fishing expedition . . . or result in a wild goose chase." (Citation omitted; internal quotation marks omitted.) *State* v. *Grant*, 89 Conn. App. 635, 647, 874 A.2d 330, cert. denied, 275 Conn. 903, 882 A.2d 678 (2005).

Here, defense counsel sought to elicit testimony from the victim as to the status of her relationship with the father of her children because it might have demonstrated that she had overreacted to the defendant's entering her room, lying on top of her, and attempting

to kiss her and touch her all over her body. We agree with the court that such evidence was speculative and remote as to the issues in the case.[17] The offer of proof was premised on hearsay from Segarra, the defendant's wife. It is far too speculative to assume that the jury would infer from the fact that the victim was estranged from her now husband that her almost immediate reporting of the incident to her cousin and to Segarra was the product of the victim's desire to reunite with the father of her children or her belief that he would rescue her from the plight of living in the basement.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[17] Furthermore, defense counsel represented to the court that she would not delve into the reasons for the victim's estrangement from her now husband. That representation is illogical given the defense offer of proof that infidelity was an issue for the victim. Without testimony concerning the reason for the estrangement, there could be no nexus to the motivation assumed by defense counsel, i.e., the victim fabricated the incident due to her husband's infidelity. See footnote 16.