STATE OF CONNECTICUT *v.* JOHN PAPANDREA
(SC 18616)

Rogers, C. J., and Palmer, Zarella, McLachlan and Bear, Js.

Argued March 14—officially released September 13, 2011

*Moira L. Buckley*, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *James G. Clark*, former senior assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. The defendant, John Papandrea, appeals from the judgment of the Appellate Court, which affirmed his conviction, following a jury trial, of nine

counts of larceny in the first degree in violation of General Statutes (Rev. to 2003) § 53a-122 (a) (2).[1] At trial, the state claimed that the defendant stole corporate funds from his employer, Homecare Management Strategies, Inc. (Homecare), in order to purchase artwork. The defendant conceded that he took the funds but asserted in his defense that he lacked the wrongful intent necessary for first degree larceny. We granted the defendant's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly conclude that the state . . . had presented sufficient evidence of the defendant's intent to commit larceny?" *State* v. *Papandrea*, 297 Conn. 902, 994 A.2d 1289 (2010). We conclude that the evidence was sufficient to permit the jury to find that the defendant had the necessary intent to commit larceny, and, therefore, we affirm the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following facts that the jury reasonably could have found. "Donna Galluzzo owns and operates Homecare. Homecare provides financial services to home health care agencies, including accounting, billing and collection. In 1991, the defendant began to work as an accountant for Omni Home Health Services [LLC] (Omni), a company owned by Galluzzo. In 1996, the defendant began to work for Homecare as a junior accountant. Many of Homecare's employees, including the defendant, performed services for White Oak Systems, LLC (White Oak). White Oak is a software development com-

---

[1] General Statutes (Rev. to 2003) § 53a-122 (a) provides in relevant part: "A person is guilty of larceny in the first degree when he commits larceny, as defined in section 53a-119, and . . . (2) the value of the property or service exceeds ten thousand dollars . . . ."

General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

pany. White Oak built a software system for Omni and also provided 'information systems' to Homecare. . . .

"In 1999, Masonicare, a health care provider, bought Omni and entered into a contract with Homecare for financial support services. Under the terms of the contract, Masonicare paid Homecare a prescribed fee, a portion of which Homecare. was obligated to pay to White Oak for software development. At about the same time that the contract was executed, Carl Caslowitz, the original owner of White Oak, transferred 85 percent of White Oak stock to the defendant, at the request of Gianfranco Galluzzo, Donna Galluzzo's husband. The stock was transferred to the defendant without any consideration for the purpose of 'corporate convenience.'[2] At the time, Homecare and White Oak had an oral agreement [pursuant to which] Homecare [would] pay White Oak's salary obligations and its direct cost of doing business. White Oak reimbursed Homecare for those costs and for services provided by Homecare employees to White Oak. Pursuant to the oral agreement, the financial obligations imposed on the two companies were tracked using 'due to/due from' accounting measures." *State* v. *Papandrea*, 120 Conn. App. 224, 226–27, 991 A.2d 617 (2010).

"A general ledger was used to keep track of Homecare's debt, including Homecare's debt to White Oak. Homecare's general ledger recorded accruals and offsets for various services performed between Homecare and White Oak. A transfer was made each month by Homecare to White Oak for salaries and expenses." Id., 232. "In 2002, Homecare had two in-house finance employees, the defendant and Cynthia O'Sullivan. In September, 2003, O'Sullivan left . . . Homecare, at which time the defendant was Homecare's sole authorized check signatory." Id., 228. "As the accountant and

---

[2] The record does not reveal the definition of "corporate convenience."

chief financial officer of Homecare, the defendant was responsible for keeping all records and books for the company. The defendant also was responsible for the preparing and maintaining of the financial records for White Oak, functioning as White Oak's chief financial officer." Id., 231.

"In early 2004, with the end of the Masonicare contract approaching, Donna Galluzzo requested that the defendant provide Homecare's full financial record in order to review the financial status of the company. The defendant was not forthcoming with the financial records. At the end of 2004, the defendant informed Donna Galluzzo that a meeting was necessary to settle the 'due to/due from' arrangement between Homecare and White Oak. On March 30, 2005, the defendant, without consideration, transferred his 85 percent of White Oak's stock back to Caslowitz. On April 1, 2005, the defendant met with Donna Galluzzo, Gianfranco Galluzzo and Caslowitz. Gianfranco Galluzzo requested the 'due to/due from' information, which the defendant refused to provide. The defendant informed Donna Galluzzo and Gianfranco Galluzzo that he had transferred his stock in White Oak back to Caslowitz, which caused Gianfranco Galluzzo to become visibly angry. The defendant's employment with Homecare was then terminated." Id., 228.

Thereafter, "Homecare hired Mahoney Sabol & Company, LLP, to conduct an audit of Homecare's finances. The audit revealed that the defendant had issued a number of checks, drawn on Homecare's accounts payable, to various art dealers. The checks had been issued between February 25, 2004, and February 11, 2005." Id. "For each purchase of artwork, the defendant indicated in the ledger the person to whom the money was paid for the artwork and recorded it in a manner that reduced Homecare's debt to White Oak. In the ledger, the defendant reduced Homecare's debt to White Oak by the

amount of each check he wrote to the art vendors. In addition, [certain] check requests to Homecare for . . . art vendors referenced Homecare's debt to White Oak." Id., 232.

"Donna Galluzzo [had] not know[n] that the defendant was purchasing artwork for his personal use with Homecare funds." Id., 228. "The defendant was authorized to issue corporate checks for business purposes only. The defendant did not obtain Donna Galluzzo's signature, his check supervisor, for any of the checks issued for the artwork. The defendant was not authorized by any Homecare officer to buy artwork for himself. The defendant never asked if he could buy artwork for himself using Homecare's funds." Id., 232. "Although the defendant claimed that Homecare owed him money, he never filed a claim to collect the [money] that Homecare allegedly owed to him and never requested that [money] that had not been transferred already be transferred from Homecare to White Oak. The defendant admitted that he had issued the Homecare checks in question and that he had purchased the artwork for his personal use. His defense at trial was that Homecare owed him money as White Oak's principal shareholder at the time he had issued the checks." Id., 228–29.

After a jury trial, the defendant was convicted of nine counts of first degree larceny. The trial court rendered judgment in accordance with the verdict,[3] and the defendant appealed to the Appellate Court, claiming, inter alia, that the evidence adduced at trial was insufficient to support his conviction because the state had failed to prove that he acted with the intent to take the money

[3] The trial court sentenced the defendant to a total effective sentence of twelve years imprisonment, execution suspended after six years, and five years of probation.

wrongfully.[4] The Appellate Court, with one judge dissenting, rejected this claim, concluding that the jury reasonably could have found that the defendant had the intent to take money that he knew did not belong to him. Id., 232. The Appellate Court specifically concluded: "[T]he jury could infer that the defendant knew he could not issue Homecare's checks for personal use, even though Homecare owed a debt to White Oak, a corporation in which the defendant was the majority shareholder, without having paid anything for the shares. The defendant was the sole signatory for Homecare and was trusted to manage the finances of Homecare. Donna Galluzzo, the sole owner of Homecare, never authorized the defendant to issue Homecare's checks for the defendant's personal use. The defendant did not request or receive permission or authority from Donna Galluzzo to collect any debts allegedly owed to him, as the majority shareholder of White Oak. Customarily, Homecare transferred money monthly to White Oak to cover salaries and expenses and did not transfer money directly to individual shareholders of White Oak. The jury could infer that the defendant, as the accountant and chief financial officer for both Homecare and White Oak, must have known that a debt to White Oak is different from a debt to him personally, even if he was the majority shareholder of White Oak. See *State* v. *Radzvilowicz*, 47 Conn. App. 1, 19, 703 A.2d 767 (It is an elementary principle of corporate law that a corporation and its stockholders are separate entities and that the title to the corporate property is vested in the corporation and not in the

---

[4] The defendant also claimed that certain portions of the trial court's jury instructions "deprived him of the right to have the state prove each element of the offenses charged beyond a reasonable doubt" and that prosecutorial impropriety during closing and rebuttal arguments "deprived [him] of his right to due process . . . ." *State* v. *Papandrea*, supra, 120 Conn. App. 226. The Appellate Court rejected both of these claims; id., 239, 248; neither of which is the subject of this appeal.

owner of the corporate stock. . . . Stockholders, even the controlling stockholder, cannot transfer or assign the corporation's propert[y] . . . [or] apply corporate funds to personal debts or objects . . . .), cert. denied, 243 Conn. 955, 704 A.2d 806 (1997). The defendant refused to provide Homecare's financial records. The jury could have found that the defendant knew that the amount of the checks he wrote to the art vendors were not sums due to him as an employee of Homecare or as a majority shareholder of White Oak." (Internal quotation marks omitted.) *State* v. *Papandrea*, supra, 120 Conn. App. 232–34.

The dissenting judge disagreed with the conclusion of the Appellate Court majority because, in her view, the evidence "overwhelming[ly]" supported the defendant's claim that he had a right to the funds that he allegedly stole. Id., 249 (*Alvord, J.*, dissenting). According to the dissenting judge, "the most compelling reason for concluding that the state failed to prove felonious intent beyond a reasonable doubt [was] the evidence that the defendant's actions were taken openly and that he did not attempt to conceal what he had done." Id., 253 (*Alvord, J.*, dissenting). The dissenting judge relied on evidence that, when the defendant wrote checks for artwork, "he did not use a fictitious name for the party to be paid or request that the check be made payable to cash. The checks, in sizeable amounts that would have attracted attention, were signed by the defendant and were made payable to individuals or to such companies as Rainmakers, Profiles in History, E.S. Lawrence Gallery and Fanfare Sports and Entertainment. On [several] check request forms, the defendant noted 'partial payment of White Oak fee' and 'due to [White Oak]' as the reasons for the requests. In Homecare's general ledger, the defendant deducted the amounts of the checks issued for artwork from the debt due White Oak from Homecare. . . . Further, the defendant ordered

the artwork via his e-mail account at Homecare and had the artwork delivered to Homecare's corporate offices. He displayed the artwork in Homecare's offices." Id., 253–54 (*Alvord, J.*, dissenting).

The dissenting judge also maintained that the evidence supported the defendant's contention that he had acted in the good faith belief that Homecare owed money to White Oak. See id., 248, 256 (*Alvord, J.*, dissenting). The dissenting judge observed that the evidence established that the defendant (1) had spoken to his attorney about the possibility of bringing an action against Homecare to collect the debt allegedly owed to White Oak, (2) had told Caslowitz that he was worried that Gianfranco Galluzzo wanted to eliminate the White Oak debt, and (3) did not buy artwork with corporate funds until Homecare and White Oak began to falter financially. Id., 253, 256–57 (*Alvord, J.*, dissenting).

On appeal to this court, the defendant contends that the Appellate Court improperly concluded that the state proved beyond a reasonable doubt that he took the funds from Homecare with the intent to steal. He maintains that, for the reasons cited by the dissenting judge, the only inference that the jury reasonably could have drawn was that he acted in the good faith belief that he was entitled to take the funds. We disagree.

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defen-

dant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact . . . but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [jury] may draw whatever inferences from the evidence or facts established by the evidence [that] it deems to be reasonable and logical. . . .

"[In addition], [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [jury], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [jury's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Davis*, 283 Conn. 280, 329–30, 929 A.2d 278 (2007). Finally, pursuant to

the waiver rule,[5] because the defendant chose to present evidence after moving unsuccessfully for a judgment of acquittal at the close of the state's case, our sufficiency review encompasses all of the evidence adduced at trial, not just the evidence presented by the state. See, e.g., *State* v. *Perkins*, 271 Conn. 218, 229, 856 A.2d 917 (2004).

Under Connecticut law, "[a] person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner." General Statutes § 53a-119. "Because larceny is a specific intent crime, the state must show that the defendant acted with the subjective desire or knowledge that his actions constituted stealing." (Internal quotation marks omitted.) *State* v. *Papandrea*, supra, 120 Conn. App. 230. "One who takes property in good faith, under fair color of claim or title, honestly believing that . . . he has a right to take it, is not guilty of larceny even though he is mistaken in such belief, since in such case the felonious intent is lacking. . . . The general rule applies . . . to one who takes it with the honest belief that he has the right to do so under a contract . . . ." (Internal quotation marks omitted.) Id., 231.

As we previously indicated, the defendant contends that the jury reasonably could not have found that he took funds from Homecare with intent to steal them. He argues in effect that the only inference the jury reasonably could have drawn from the evidence was

---

[5] "Under the waiver rule, when a motion for acquittal at the close of the state's case is denied, a defendant may not secure appellate review of the trial court's ruling without foregoing the right to put on evidence in his or her own behalf. The defendant's sole remedy is to remain silent and, if convicted, to seek reversal of the conviction because of insufficiency of the state's evidence. If the defendant elects to introduce evidence, the appellate review encompasses the evidence in toto. The defendant then runs the risk that the testimony of defense witnesses will fill an evidentiary gap in the state's case." *State* v. *Rutan*, 194 Conn. 438, 440, 479 A.2d 1209 (1984).

that he acted under a bona fide claim of right—specifically, that he acted in the good faith belief that Homecare owed money to White Oak and that, as a part owner of White Oak, he was entitled to take funds from Homecare to satisfy the debt. In support of this claim, the defendant cites evidence indicating, among other things, that (1) Homecare owed money to White Oak under a contract between Homecare and Masonicare, (2) the defendant and Caslowitz contacted an attorney to discuss whether the contract was enforceable, (3) the defendant told Caslowitz that he was concerned that Gianfranco Galluzzo wanted to " 'zero out' " Homecare's debt to White Oak, (4) the defendant wrote "partial [payment] of White Oak fee" or "due to [White Oak]" on several check request forms, and (5) in Homecare's general ledger, the defendant deducted the amount of the artwork-related checks from the balance of the debt owed to White Oak.

Even if we assume, arguendo, that the jury reasonably could not have found that the defendant lacked a good faith belief that Homecare owed money to White Oak, the evidence was more than sufficient to establish that the defendant did not believe either that the debt was owed to him personally or that he was entitled to take funds from Homecare to satisfy the debt. With respect to whether the defendant believed that he was collecting money owed directly to him, the jury reasonably could have found that the defendant knew that a debt to White Oak was different from a debt to him personally. The jury could have based this finding on the commonsense assumption that, because the defendant was an experienced financial officer who had graduated from Quinnipiac University with a concentration in accounting and excellent grades, he must have known that debts owed to a company are not the same as debts owed to a company's owners. See *State* v. *Long*, 293 Conn. 31, 42, 975 A.2d 660 (2009) ("[i]n deciding cases

. . . [j]urors are not expected to lay aside matters of common knowledge or their own observations and experiences . . . but rather . . . to apply them to the facts as presented to arrive at an intelligent and correct conclusion" [internal quotation marks omitted]). Having found that the defendant must have known that a debt to White Oak was different from a debt to him personally, the jury reasonably could have concluded that, when he took funds from Homecare, he was not acting in the good faith belief that Homecare owed him money.[6]

---

[6] To support his contrary view, the defendant relies on the testimony of defense expert Thomas Thorndike, who, after reviewing Homecare's financial records, testified that Homecare may have owed a personal debt of $600,000 to the defendant as a "key employee." Contrary to the defendant's claim, however, those records do not reveal the key employee's identity. Thorndike acknowledged as much in his testimony. In the absence of any evidence indicating that the defendant was, in fact, the key employee, the jury reasonably could have concluded that the defendant did not believe that he was the employee to whom Homecare allegedly owed money.

The defendant also notes that Homecare's "adjusted . . . balance for the period ending December 21, 1999, indicates that there was $600,000 to accrue to 'deferred compensation' under the account name 'accountant' " and that he was Homecare's accountant during that time frame. The defendant further notes that, in 2004, Homecare "issued a 1099 MISC [Internal Revenue Service (IRS) tax form] to [him] in the amount of $596,774.14 for miscellaneous income. [Homecare's auditor] testified that this amount represented the stolen funds, and, according to [the auditor], IRS regulations required reporting in this manner. . . . [According to the defendant] [t]his testimony conflict[ed] with IRS regulations. The instructions for the 2004 1099 MISC form describe the various circumstances that trigger the issuance of a 1099 MISC form [and] all relate to legally obtained income . . . ." (Citation omitted.) The jury reasonably could have discounted these relatively ambiguous pieces of evidence and found that the defendant did not take Homecare funds in the belief that he was owed the funds as deferred compensation. As we explain hereinafter, there was ample evidence on which the jury reasonably could have relied in finding that the defendant acted with the intent to steal, including evidence demonstrating that the defendant (1) knew that he lacked authority or permission to take the funds, (2) did not begin withdrawing Homecare funds for personal use until no other employee was watching, (3) refused to share Homecare's financial records with Donna Galluzzo and repeatedly delayed Homecare's annual audit, and (4) conducted the unauthorized transactions in a manner unlikely to reveal their illicit nature.

The jury also could have concluded that, when the defendant took funds from Homecare, he was not acting in the good faith belief that he was collecting a debt on behalf of White Oak. Perhaps the most compelling basis for this conclusion is that the defendant put the funds directly into his own pocket, rather than, for instance, transferring them to White Oak or sharing them with Caslowitz, who also was a White Oak principal.[7] Even though the record contains no evidence of how White Oak customarily distributed income to its principals, the jury reasonably could have drawn on common sense to infer that, when the defendant took funds from Homecare and put them directly into his own pocket, he was not acting on the belief that he was collecting a debt *on White Oak's behalf.* Bolstering this inference were several pieces of evidence indicating that the defendant did not really consider himself to be a true owner of White Oak. For example, there was uncontroverted testimony that the defendant had acquired his 85 percent share in White Oak from Caslowitz for no consideration and that the stock transfer was undertaken merely for the sake of "corporate convenience . . . ." There also was uncontroverted testimony that the defendant transferred the White Oak stock back to Caslowitz for no consideration, just two days before he was terminated, and that, upon transferring the stock, he described Caslowitz as its "rightful owner." On the basis of this evidence, the jury reasonably could have inferred that the defendant did not consider himself to be a true owner of White Oak and, therefore, did not believe that he would be the ultimate beneficiary of any money owed to White Oak.

Our review of the record reveals at least four additional strains of circumstantial evidence that, taken together, strongly support the jury's finding that the defendant acted with the intent to steal. See, e.g., *State*

---

[7] The defendant never shared any of what he took with Caslowitz.

v. *Hedge*, 297 Conn. 621, 657, 1 A.3d 1051 (2010). ("[D]irect evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." [Internal quotation marks omitted.]). First, several witnesses testified that the defendant knew full well that he lacked authority or permission to take the funds. Donna Galluzzo testified that Homecare never authorized the defendant to use corporate money to purchase artwork for himself and that the defendant never requested permission to use corporate money for such a purpose. Similarly, O'Sullivan, who, prior to her departure in September, 2003, shared responsibility with the defendant for Homecare's day-to-day finances, testified that the defendant never was authorized to write Homecare checks for personal use and that she never would have written a Homecare check to an individual for personal use unless that individual had been an owner or an owner's direct relative. Finally, Homecare's outside auditor, Robert Zdon, testified: "I've worked with [the defendant] for ten years. . . . [H]e knew what was approved and what wasn't approved, in my professional opinion." Zdon also explained that every accountant is a fiduciary, "a person who is put in charge of . . . protecting the interest of a principal or a person or a company that they work for." Zdon testified that, if a fiduciary wanted to write a check to himself from his company's account, the proper procedure would be for the fiduciary to "go to the [company] and have the [company] authorize it . . . in writing." In light of the testimony of these three witnesses, the jury reasonably could have concluded that the defendant knew he lacked authority or permission to take the funds.

Second, there was uncontroverted evidence that the defendant did not begin withdrawing Homecare funds

for personal use until no other employee was watching. The Homecare check register from 2002 to 2005 reveals that the defendant began writing checks to art dealers only after O'Sullivan departed Homecare in September, 2003. After O'Sullivan's departure, the defendant was the sole Homecare employee dealing on a daily basis with checks and bookkeeping. He also was the only person in charge of providing financial reports to management. Donna Galluzzo entrusted the defendant with these responsibilities because, in her words, "over the years, he proved incredibly capable, and I thought he was incredibly trustworthy. And so, over time, I never thought twice to second guess [the defendant] on his professional opinion, let alone on his character." Gianfranco Galluzzo testified similarly: "I had [the defendant] in full trust, full, to my heart . . . . [The defendant] is more like a son to me . . . ." On the basis of this evidence, the jury reasonably could have inferred that the defendant took advantage of the Galluzzos' trust and began making illicit withdrawals when no other employee likely would notice.

Third, there was evidence that the defendant refused to share Homecare's accounting records with Donna Galluzzo and repeatedly postponed Homecare's annual audit. As we previously indicated, beginning in the fall of 2003, Donna Galluzzo asked the defendant "multiple times to provide [financial] information" about Homecare. Each time, the defendant either rebuffed her entirely or shared only partial information. These delays eventually yielded what Donna Galluzzo described as "a very unbearable state . . . ." At the meeting at which the defendant's employment with Homecare was terminated, Gianfranco Galluzzo asked the defendant to turn over financial information, and, once again, he refused. The defendant also repeatedly delayed Homecare's annual audit. In light of this pattern of refusal and delay, the jury reasonably could have found that the defendant

harbored a desire to prevent evidence of his misdeeds from coming to light.[8]

Fourth, the jury reasonably could have found that the defendant conducted the unauthorized transactions in a manner unlikely to reveal their illicit nature. Specifically, the jury could have found that the manner in which the defendant recorded the unauthorized transactions in Homecare's accounting records obscured the fact that these transactions were indeed unauthorized. The relevant entries in the Homecare check register contain nothing to indicate that the transactions involved artwork, that the payees were art dealers, or that the ultimate beneficiary of each transaction was the defendant or, for that matter, White Oak. For most of the unauthorized transactions, under the heading "Invoice Number," the defendant either left a blank space or wrote an uninformative string of numbers consisting simply of the invoice date without slashes between the month, the day, and the year, or the month and year. For a host of innocuous transactions, by contrast, under the heading "Invoice Number," the defendant, or another record keeper, wrote such informative words or phrases as "payment," "rent," "full page ad," "taxes," "reim expenses," "reim payroll," "contribution," and "donation." In light of this discrepancy, the jury reasonably could have inferred that, if the defendant had so desired, he might easily have made informative notations in the entries corresponding to the

---

[8] The defendant asserts that it would have been unreasonable for the jury to infer that he had made it impossible for Donna Galluzzo to access her own company's financial records. Regardless of whether this assertion is true, it is beside the point. It is immaterial whether the defendant's conduct *actually* prevented Donna Galluzzo from reviewing Homecare's financial records. What matters is that the defendant's conduct fairly could be interpreted as manifesting a *desire* to prevent Donna Galluzzo from reviewing Homecare's financial records. On this basis, the jury reasonably could have inferred that the defendant knew that he had acted wrongfully and therefore sought to delay or prevent discovery of Homecare's financial records.

purchase of artwork, notations similar to those provided for legitimate transactions. On the basis of this inference, the jury also could have found that the defendant deliberately failed to make such notations and, instead, recorded the unauthorized transactions in a manner calculated to obscure their unlawful nature.

Like the defendant's entries in the check ledger, his entries in Homecare's general ledger also obscured the fact that the relevant transactions were improper. Regarding a representative transaction involving a certain art dealer, namely, Sal Abbinanti, Zdon testified that the relevant ledger entry contained nothing to indicate that the transaction concerned a debt allegedly owed to the defendant or that the transaction involved the purchase of artwork for the defendant's personal use. On the basis of his review of the entire general ledger, Zdon further testified that not one of the entries containing Abbinanti's name mentioned the defendant as a beneficiary. Furthermore, Thomas Thorndike, the defendant's own expert, testified more generally that the general ledger would have been unintelligible to someone without an accounting background. Even at a major company like Union Carbide Corporation, where Thorndike once worked, managers unaided by persons with an accounting background generally could not determine when the "books [were] being cooked . . . ." Finally, compounding the general ledger's impenetrability was its sheer size. The general ledger having been 1662 pages long and approximately "eight inches" thick, the jury reasonably could have concluded that any incriminating transactions that the defendant recorded therein were effectively hidden in plain view.

Despite this evidence, the defendant asserts that he "acted openly" by "signing the checks at issue with his own name" and "making [them] out to the various . . . art dealers rather than concealing the purpose of the

checks by listing fictitious vendors . . . ."[9] It is probably true that the defendant might have done even more to conceal his conduct. Perhaps, as the defendant implies in his brief, his misconduct would have been even more difficult to detect if he had made the corporate checks payable to "cash," invented fake payees, ordered the artwork by means other than his business e-mail account, or had the artwork delivered to a location other than Homecare's corporate offices. None of this matters. Even if it were true that the defendant could have concealed his misdeeds more thoroughly, it would hardly follow that the defendant did not conceal his misdeeds at all. Contrary to the defendant's contention, it also is immaterial that he openly displayed the artwork in Homecare's offices, because the jury reasonably could have credited Donna Galluzzo's testimony that she had no idea of the artwork's value or that its value was beyond the means of someone making approximately $90,000 per year, such as the defendant. Indeed, the jury reasonably could have inferred that the defendant knew and relied on the fact that Donna Galluzzo or any Homecare employee would not deem the artwork suspicious in the least. Finally, the jury reasonably could have discounted the probative value of the check requests on which the defendant wrote such things as "due to [White Oak]," because none of these check requests—or at least none in evidence—corresponded to a single transaction on which the charges against the defendant were based. In any

[9] Specifically, the defendant argues that he "acted openly: (1) by signing the checks at issue with his own name; (2) by not forging Donna Galluzzo's name; (3) by making the checks out to the various comic book art dealers rather than concealing the purpose of the checks by listing fictitious vendors to whom it would seem more likely for [Homecare] to remit payment; (4) by recording the checks in the [Homecare] general ledger, who they were made out to, the actual amount taken, and deducting them from the White Oak debt; and (5) by drafting check requests consistent with the information in the [Homecare] general ledger and specifically justifying the checks as due to White Oak."

event, even if the evidence had shown unequivocally that the defendant did nothing to conceal his conduct, the jury still could have found that the defendant acted with the intent to steal. A person may act with the intent to steal even if his conduct is devoid of stealth. Concealment is simply not an element of larceny.

In sum, there was ample evidence demonstrating that, when the defendant took funds from Homecare, he acted with the intent to steal them. The evidence indicated that the defendant (1) knew that he lacked authority or permission to take Homecare funds for personal use, (2) did not begin withdrawing Homecare funds for personal use until no other employee was watching, (3) refused to share Homecare's financial records with Donna Galluzzo and repeatedly delayed Homecare's annual audit, and (4) conducted the unauthorized transactions in a manner unlikely to reveal their true nature. On the basis of this evidence, together with the evidence tending to show that the defendant did not act in the good faith belief that he was collecting a debt, the jury reasonably could have concluded that the defendant took funds from Homecare with the intent to steal them.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.