******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* KRIS MARSAN
## (AC 40396)

Prescott, Elgo and Bishop, Js.

*Syllabus*

Convicted, after a jury trial, of the crimes of burglary in the third degree and larceny in the sixth degree, the defendant appealed to this court. The defendant, who had worked for the elderly victim as a home aide, assisting her with various daily activities, was convicted in connection with her conduct in taking money and jewelry from the victim's bedroom, while the victim was away at a facility rehabilitating injuries that she had sustained in a fall in her home. During that time, the victim's son had placed a hidden camera in the victim's bedroom, which recorded the defendant rummaging through the victim's dressers and removing cash from an envelope and a tin. The son filed a complaint with the police and provided them with a copy of the video recording. Thereafter, T and M, detectives, visited the defendant at her home to discuss the complaint and the video recording. The defendant invited the detectives into her home, and her minor son who was present was asked to leave the room before they discussed the matter. The detectives then proceeded to play the video on a laptop computer for the defendant, who immediately identified herself as the person depicted in the victim's bedroom removing money from the envelope and the tin, and, thereafter, admitted to taking jewelry from the victim's home. At trial, the defendant filed a motion to suppress all statements she made to T and M at her home on the ground that the statements were the result of a custodial investigation without her being provided with warnings pursuant to *Miranda* v. *Arizona* (384 U.S. 436). Following an evidentiary hearing, the trial court denied the motion to suppress, concluding that the defendant was not in custody for purposes of *Miranda* when she was questioned by the detectives at her home. *Held*:

1. There was insufficient evidence to support the defendant's conviction of burglary in the third degree, as she was licensed and privileged to be in the victim's home at the time she committed the crime of larceny and at no time was the license either explicitly or implicitly revoked, and this court declined the state's invitation to extend to the facts of this case the narrow exception that a license to remain in a premises is implicitly revoked upon the commission of a crime in a manner that is likely to terrorize its occupants; although the state relied on that exception in support of its contention that there was sufficient evidence for the jury to conclude that the defendant's license to remain in the victim's home was implicitly revoked the moment she committed the larceny, to extend the exception would enlarge the crime of burglary to an untenable degree, and the state presented no evidence from which the jury reasonably could have concluded that that the defendant committed larceny in a manner likely to terrorize the victim or occupants in the victim's home, which evidence was necessary to prove that the defendant's license to be in the victim's home had been revoked and that she had remained in the home unlawfully, as it was undisputed that only the defendant was present in the victim's home when she committed the larceny, and she could not have committed a larceny in a manner likely to terrorize a victim who was not in the home at the time.

2. The defendant could not prevail on her claim that the trial court improperly denied her motion to suppress the statements she made to T and M while watching the video recording in her home, that court having reasonably concluded that the defendant was not in custody for purposes of *Miranda* when she was questioned by the detectives; no reasonable person in the defendant's position would have felt that she was in custody for purposes of *Miranda*, as the record revealed that throughout her encounter with T and M, the defendant was in her home, free to move around and not restrained, that T and M were dressed in plain clothes and were invited by the defendant into her home to discuss the complaint, that although there was a dispute as to who asked the defendant's son to leave the room, the defendant continued to engage

in small talk with the detectives in her kitchen as she put away her groceries, that there were no threats of arrest at any point during the encounter, which lasted no more than one hour, and that the defendant remained in the home after the detectives left, and the fact that the defendant was a suspect at the time of the encounter did not transform the encounter into a custodial interrogation.

Argued March 11—officially released August 20, 2019

*Procedural History*

Substitute information charging the defendant with two counts of the crime of burglary in the third degree and with the crime of larceny in the third degree, brought to the Superior Court in the judicial district of Fairfield, geographical area number two, where the court, *Holden, J.*, denied the defendant's motion to suppress certain statements; thereafter, the matter was tried to the jury; verdict and judgment of guilty of one count of burglary in the third degree and of the lesser include offense of larceny in the sixth degree, from which the defendant appealed to this court. *Reversed in part; judgment directed; further proceedings.*

*James B. Streeto*, senior assistant public defender, with whom was *Declan J. Murray*, former certified legal intern, for the appellant (defendant).

*Melissa Patterson*, assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Richard L. Palumbo, Jr.*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ELGO, J. The defendant, Kris Marsan, appeals from the judgment of conviction, rendered after a jury trial, of one count of burglary in the third degree in violation of General Statutes § 53a-103, and one count of larceny in the sixth degree in violation of General Statutes § 53a-125b. On appeal, the defendant claims that (1) the evidence was insufficient to establish that she "unlawfully remained" on the victim's property with respect to burglary in the third degree, and (2) the trial court improperly denied her motion to suppress statements she had made to police officers during an interview in her home without being provided with *Miranda*[1] warnings. We agree with the defendant's first claim and, therefore, reverse in part the judgment of the trial court.

On the basis of the evidence adduced at trial, the jury reasonably could have found the following facts. The defendant began working as a home aide for the widowed eighty-six year old victim, Eleanor Beliveau, in May, 2014. The defendant was hired to assist the victim with grocery shopping, cleaning, laundry, and various other daily activities. The victim's long-term insurance plan required that she first pay the defendant directly before seeking reimbursement from her insurer by submitting a form detailing the defendant's work. At all relevant times, the victim's son, Ronald Beliveau,[2] had power of attorney over his mother's affairs and continued to assist with his mother's finances.

In January, 2015, the victim sustained serious injuries from a fall in her home. After her hospitalization, the victim subsequently began her rehabilitation at a facility for the elderly where she would remain until February 13, 2015. As a result, the defendant's work hours were reduced. Nevertheless, she continued to perform tasks at the victim's home and remained in frequent contact with Beliveau. The defendant, however, soon became concerned about the reduction in her hours. At first, she asked Beliveau to submit reimbursement request forms to the victim's provider to frontload her hours so that she could be paid up front. Beliveau declined the offer, believing that to do so would amount to fraud. Frustrated with his answer, the defendant threatened to quit.

From those conversations, Beliveau became suspicious of the defendant's behavior and grew concerned about the valuables that remained in the victim's vacant home. In late January, 2015, his suspicions intensified after he noticed both a discrepancy in the amount of money that the victim kept in an envelope for emergencies and missing jewelry from her dresser. That discovery prompted Beliveau to set up a hidden camera, known as a nanny cam, in the victim's bedroom to capture a dresser containing an envelope with exactly $100 in twenty dollar bills.

On January 30, 2015, the defendant entered the victim's home and notified Beliveau that she intended to perform various chores. Later that same day, Beliveau and the defendant signed the required insurance form to provide to the victim's insurance provider, which reflected that the defendant had worked from 10:00 a.m. to 1:00 p.m. that day. The following day, Beliveau entered the victim's home to check on the envelope of cash and immediately noticed that $40 was missing. Upon reviewing the nanny cam footage, Beliveau observed the defendant rummaging through the victim's dressers and removing cash from both the envelope in question and a tin in a separate dresser drawer. With this evidence in hand, Beliveau filed a complaint with the Fairfield Police Department and provided the police with a copy of the video recording.

On February 2, 2015, Detectives Jason Tackacs and Kevin McKeon visited the defendant's house to discuss Beliveau's complaint and the footage he had provided to them. When the defendant answered the door, the detectives asked whether she would be willing to speak about the complaint they had received. The defendant agreed and invited Tackacs and McKeon into her home. Upon entering, Tackacs, McKeon, and the defendant eventually made their way into her kitchen, where Tackacs played the recording to the defendant on a laptop computer. As Tackacs played the nanny cam footage, the defendant immediately identified herself as the person depicted in the victim's bedroom removing money from the envelope and the tin, providing various explanations for doing so. Initially, the defendant explained that she was taking the money for the victim to use at the rehabilitation facility. After Tackacs dismissed her account, the defendant next claimed that she took the money because she was upset over not receiving a Christmas bonus. The defendant then offered a third explanation, stating that she was upset over her hours being cut as a result of the victim's temporary stay at the rehabilitation facility.

As the conversation progressed, the defendant admitted to taking jewelry from the victim's home, including a pin, a necklace and a bracelet, but claimed to have returned the necklace and bracelet after feeling remorseful. When Tackacs asked whether the pin could be located, the defendant claimed to have sold it to a consignment shop that was owned by a friend. Upon leaving the defendant's house, Tackacs provided her with his contact information.

Sometime after the encounter at her home, the defendant contacted Tackacs by telephone to arrange for the return of $80 that she claimed was the total amount taken from the victim's home and the pin she had recovered from the consignment shop. On February 8, 2015, the defendant arrived at the Fairfield Police Department and met with Tackacs in his office. The defendant

turned over a money order in the amount of $80 and the pin she claimed belonged to the victim. Thereafter, Tackacs met with Beliveau to discuss his encounter with the defendant and to ascertain whether the pin could be identified. Beliveau was provided with the $80 money order but was unable to identify the pin as belonging to the victim.

On October 31, 2016, the state charged the defendant with two counts of burglary in the third degree in violation of § 53a-103 and a third count of larceny in the third degree in violation of General Statutes §§ 53a-119 and 53a-124. A jury trial was held on November 7, 8, 9, 10, and 14, 2016. On November 7, 2016, the defendant filed a motion to suppress all statements, admissions and confessions made by her to the police and any evidence of the $80 and the pin she returned to the Fairfield Police Department. Following an evidentiary hearing, the court denied that motion. The jury thereafter found the defendant guilty of one count of burglary in the third degree and the lesser included offense of larceny in the sixth degree. The court sentenced the defendant to a total effective term of five years of incarceration, execution suspended after eighteen months, followed by three years of probation. This appeal followed.

I

The defendant first claims that there was insufficient evidence adduced at trial to support her conviction of burglary in the third degree. Specifically, she argues that she was licensed and privileged to be in the victim's home at the time she committed the crime of larceny and that at no time was the license either explicitly or implicitly revoked. In response, the state argues that there was sufficient evidence for the jury to conclude that the defendant's license to remain in the victim's home was implicitly revoked the moment she committed larceny. We agree with the defendant.

A

Although the defendant characterizes this issue as a claim of insufficient evidence, the critical question is the viability of the legal theory advanced by the state. Therefore, before we can address whether the evidence was sufficient to sustain the defendant's conviction, we must first resolve the legal issue raised by the state regarding the elements of the offense of burglary. Because that issue presents a question of law, our review is plenary. See *State* v. *Hayward*, 116 Conn. App. 511, 515, 976 A.2d 791, cert. denied, 293 Conn. 934, 981 A.2d 1077 (2009).

A person is guilty of burglary in the third degree when he or she "enters or remains unlawfully in a building with intent to commit a crime therein." General Statutes § 53a-103 (a). "A person 'enters or remains unlawfully' in or upon premises when the premises, at the time of

such entry or remaining, are not open to the public and when the actor is not otherwise licensed or privileged to do so." General Statutes § 53a-100 (b). "[T]o remain unlawfully means that the initial entering of the building . . . was lawful but the presence therein became unlawful because the right, privilege or license to remain was extinguished." (Internal quotation marks omitted.) *State* v. *Stagnitta*, 74 Conn. App. 607, 612, 813 A.2d 1033, cert. denied, 263 Conn. 902, 819 A.2d 838 (2003).

"A license in real property is defined as a personal, revocable, and unassignable privilege, conferred either by writing or parol, to do one or more acts on land without possessing any interest therein. . . . Generally, a license to enter premises is revocable at any time by the licensor. . . . It is exercisable only within the scope of the consent given. . . . The term, privilege, is more general. It is a right or immunity granted as a peculiar benefit, advantage, or favor; special enjoyment of a good or exemption from an evil or burden; a peculiar or personal advantage or right esp. when enjoyed in derogation of common right; prerogative. . . . The phrase, licensed or privileged, as used in [our burglary statutes], is *meant as a unitary phrase, rather than as a reference to two separate concepts.*" (Citations omitted; emphasis altered; internal quotation marks omitted.) *State* v. *Grant*, 6 Conn. App, 24, 29–30, 502 A.2d 945 (1986).

On appeal, the defendant asserts that the nonviolent nature of her criminal conduct inside the home did not constitute an implicit waiver of her license. It is undisputed that the defendant had permission to be in the victim's home. The state contends that the defendant's license or privilege to remain in the victim's home was implicitly revoked once she engaged in larcenous conduct, thus constituting "unlawful remaining" for purposes of third degree burglary. In particular, the state contends that the defendant's larcenous conduct went beyond the scope of the consent granted to her and, therefore, constituted an implicit revocation of her privilege to remain in the victim's home. According to the state, because the defendant did not have permission to steal items from the victim's home, she exceeded the scope of her license and, consequently, that license was implicitly revoked by operation of law.[3]

In support of its novel legal theory, the state relies heavily on a narrow exception carved out in a handful of cases that hold that a license to remain within a premises is implicitly revoked upon the commission of a crime committed in a manner that is likely to terrorize its occupants. See *State* v. *Allen*, 216 Conn. 367, 384, 579 A.2d 1066 (1990); *State* v. *Bharrat*, 129 Conn. App. 1, 25–26, 20 A.3d 9, cert. denied, 302 Conn. 905, 23 A.3d 1243 (2011); *State* v. *Morocho*, 93 Conn. App. 205, 218–19, 888 A.2d 164, cert. denied, 277 Conn. 915, 895

A.2d 792 (2006); *State* v. *Reyes*, 19 Conn. App. 179, 192–93, 562 A.2d 27 (1989), cert. denied, 213 Conn. 812, 568 A.2d 796 (1990); *State* v. *Grant*, supra, 6 Conn. App. 29–31. The state is correct that there is support for the proposition that "even if one is lawfully admitted into a premises, the consent of the occupant may be implicitly withdrawn if the entrant terrorizes the occupants." *State* v. *Henry*, 90 Conn. App. 714, 726, 881 A.2d 442, cert. denied, 276 Conn. 914, 888 A.2d 86 (2005). Such cases, however, are inapposite to the underlying facts of the present matter. Significantly, the factual circumstances in each of the cases relied on by the state concern a defendant who—while lawfully on the premises—committed a crime in a manner that was likely to terrorize its occupants.

For instance, in *State* v. *Reyes*, supra, 19 Conn. App. 191–92, this court rejected the defendant's argument that he had not unlawfully remained where, after being invited into the victim's home, the defendant drew a gun on the victim and stole a radio from her bedroom. This court noted that "[a] drawn gun creates an inherently threatening situation. Evidence that a defendant subsequently pointed a gun at one who had the right to admit him to the premises, and did admit him to the premises, clearly can form the basis for the inference that consent to remain was implicitly withdrawn and thus that the individual 'unlawfully remained' within the meaning of the [burglary] statute." Id., 192–93.

In *State* v. *Allen*, supra, 216 Conn. 380–81, our Supreme Court rejected the defendant's argument that he had not unlawfully remained in a condominium after accompanying an assailant who had been invited by the victim. When the defendant accompanied the assailant into the victim's condominium, the defendant encountered the victim upstairs, naked, gagged, and tied up. Id., 381–82. Our Supreme Court explained that even if he was privileged to be in the victim's home, "it is clear that consent to remain was implicitly withdrawn and thus that the [defendant] unlawfully remained within the meaning of the statute." (Internal quotation marks omitted.) Id., 382, citing *State* v. *Reyes*, supra, 19 Conn. App. 193.

Similarly, in *State* v. *Bharrat*, supra, 129 Conn. App. 3–4, this court rejected the defendant's argument that because he had been invited into the victim's home before viciously stabbing him in his sleep, he was licensed to be on the premises and, therefore, had not "unlawfully remained" for purposes of his burglary conviction. In rejecting this assertion, this court noted that "even if one is lawfully admitted into a premises, the consent of the occupant may be implicitly withdrawn if the entrant terrorizes the occupants. . . . Here, there was ample evidence that the defendant, having entered the victim's residence lawfully, had engaged in the type of conduct likely to cause terror to an occupant." (Cita-

tions omitted; internal quotation marks omitted.) Id., 25–26.

In *State* v. *Morocho*, supra, 93 Conn. App. 208–209, 217, this court rejected the argument that because the defendant received a key and permission from the landlord to enter a basement where another tenant was living, he was licensed to be there when he sexually assaulted the tenant in the middle of the night. In rejecting that assertion outright, the court noted that "[t]he original and basic rationale of the crime [of burglary] is the protection against invasion of premises likely to terrorize occupants. . . . [W]hatever possible license the defendant thought he had to enter the victim's bedroom . . . that license was withdrawn when he refused to identify himself, charged toward the victim, lay on top of her and attempted to kiss and to touch her all over her body." (Citations omitted; internal quotation marks omitted.) Id., 218–19.[4]

In each case cited by the state, a defendant's privilege to remain lawfully on the premises was implicitly revoked because the nature of the defendant's conduct was inherently likely to terrorize occupants.[5] There is a strong rationale for this limited but important exception, because a victim is either unlikely or incapable of withdrawing consent in the face of potential or actual harm. As the state candidly acknowledged at oral argument before this court, to apply the exception to the facts in this case would broaden its application. We decline the state's offer.

Alternatively, the state argues that, notwithstanding the absence of terrorizing conduct, the defendant had exceeded the scope of the consent granted to her because her larceny "was demonstrably outside the scope of the defendant's employment." According to the state, this constituted a separate and distinct basis on which the defendant's license was implicitly revoked.

This court has stated, in dictum, that even if a defendant's conduct was not likely to cause terror to the victim, "the jury could consider the scope of the license or privilege that the victim granted the defendant and, specifically, whether the defendant's remaining in the premises became unlawful because he had exceeded the scope of the victim's consent to remain in the premises."[6] *State* v. *Bharrat*, supra, 129 Conn. App. 26, citing *State* v. *Allen*, supra, 216 Conn. 380. For the reasons already discussed with respect to the state's first argument, we decline to extend this doctrine to the facts presented here.

B

Having resolved the standard to be applied to the element in dispute, we now turn to the defendant's claim of insufficient evidence. "In reviewing a sufficiency of the evidence claim, we apply a two part test.

First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Chemlen*, 165 Conn. App. 791, 816, 140 A.3d 347, cert. denied, 322 Conn. 908, 140 A.3d 977 (2016).

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [jury's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Papandrea*, 302 Conn. 340, 348–49, 26 A.3d 75 (2011). "We also note that our sufficiency review does not require initial consideration of the merits of [the defendant's evidentiary claims] . . . . Claims of evidentiary insufficiency in criminal cases are always addressed independently of claims of evidentiary error." (Internal quotation marks omitted.) *State* v. *Coyne*, 118 Conn. App. 818, 825–26, 985 A.2d 1091 (2010).

"Review of any claim of insufficiency of the evidence introduced to prove a violation of a criminal statute must necessarily begin with the skeletal requirements of what necessary elements the charged statute requires to be proved. . . . Once analysis is complete as to what the particular statute requires to be proved, we then review the evidence in light of those statutory requirements." (Citation omitted; internal quotation marks omitted.) *State* v. *Berthiaume*, 171 Conn. App. 436, 445, 157 A.3d 681, cert. denied, 325 Conn. 926, 169 A.3d 231, cert. denied,    U.S.    , 138 S. Ct. 403, 199 L. Ed. 2d 296 (2017).

Viewing the evidence in the light most favorable to sustaining the verdict, the state has adduced no evidence from which a jury reasonably could conclude that the larceny committed by the defendant was undertaken in a manner likely to terrorize the victim or any

occupants in the victim's home.[7] Rather, the evidence established quite the contrary. Undermining the state's argument is the undisputed fact that no one but the defendant was present in the home at the time she committed the larceny at issue. Although we acknowledge the fact specific nature of this inquiry, it is, nevertheless, difficult to imagine a scenario where a person could be terrorized by a defendant's conduct absent the person's presence in the home at the time the crime is committed. On the basis of the facts of this case, we conclude that the defendant could not have committed a larceny in a manner likely to terrorize the victim who was not home at the time of the crime.

In sum, for her license to have been implicitly revoked in order to have "remained unlawfully" for purposes of burglary, the defendant must have committed larceny in a manner likely to terrorize occupants of the victim's home. The state has presented no evidence that such circumstances existed here. Accordingly, we conclude that there was insufficient evidence to sustain the defendant's conviction of burglary in the third degree.[8]

## II

The defendant also claims that the court improperly denied her motion to suppress the inculpatory statements she made to Tackacs and McKeon in her home on February 2, 2015. Specifically, she argues that her statements made to the detectives while watching the recording of her larceny were the result of a custodial interrogation without her being provided with *Miranda* warnings. The court rejected this argument, finding that the defendant was not in custody for purposes of *Miranda*. We agree with the court.

The following additional facts are relevant to this issue on appeal. On November 7 and 8, 2016, the court held an evidentiary hearing on the motion to suppress and heard testimony from Tackacs, McKeon, the defendant, and the defendant's minor son, D. Tackacs testified that he and McKeon approached the defendant's home on February 2, 2015 dressed in plain clothes with their guns and badges displayed on the outside of their attire. When the defendant answered the door, Tackacs and McKeon identified themselves and asked whether she would be willing to speak to them about Beliveau's complaint. The defendant agreed and invited Tackacs and McKeon inside. Upon entering, Tackacs and McKeon noticed D, and, according to their testimony, suggested to the defendant that D leave the room. Tackacs and McKeon explained that they made the suggestion to make the defendant more comfortable considering the nature of what they intended to discuss with her. The defendant and D both testified that D was ordered to leave as soon as Tackacs and McKeon entered the home. Notwithstanding this point of contention, D did leave the home near the beginning of the encounter. The defendant, Tackacs, and McKeon

eventually made their way into the defendant's kitchen. The three engaged in small talk and discussed Beliveau's complaint while the defendant continued to put away her groceries. After McKeon finished setting up the laptop computer to play the video recording, the defendant sat down next to Tackacs.[9] Upon Tackacs playing the video, the defendant immediately identified herself in the recording, admitted to taking $80 from the victim, and further admitted to taking jewelry from the victim's home.

Before leaving, Tackacs provided the defendant with his contact information in the event she had any more questions about the complaint. The entire encounter lasted no more than one hour, during which the defendant was not given *Miranda* warnings. At no point was the defendant restrained, placed in handcuffs, had her movements restricted, or subjected to any type of force. According to Tackacs and McKeon, they did not make any threatening comments to the defendant, and the defendant did not seem nervous at any time during the encounter. The defendant would thereafter contact Tackacs on a number of occasions with questions, and she eventually returned $80 and the pin to Tackacs at the Fairfield Police Department on February 9, 2015. Tackacs testified that he found the defendant to be very cooperative and pleasant to deal with throughout the process.

We begin by setting forth the applicable standard of review. "On appeal, we apply a familiar standard of review to a trial court's findings and conclusions in connection with a motion to suppress. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . The conclusions drawn by the trial court will be upheld unless they are legally and logically inconsistent with the evidence." (Internal quotation marks omitted.) *State* v. *Janulawicz*, 95 Conn. App. 569, 574, 897 A.2d 689 (2006).

"Our Supreme Court has set forth the following principles regarding the requirement of *Miranda* warnings . . . . Although [a]ny [police] interview of [an individual] suspected of a crime . . . [has] coercive aspects to it . . . only an interrogation that occurs when a suspect is *in custody* heightens the risk that statements obtained therefrom are not the product of the suspect's free choice. . . . Consequently, police officers are not required to administer *Miranda* warnings to everyone whom they question . . . rather, *they must provide such warnings only to persons who are subject to custodial interrogation.* . . . To establish entitlement to *Miranda* warnings, therefore, the defendant must satisfy two conditions, namely, that (1) he was in custody when the statements were made, and (2) the statements were obtained in response to police questioning." (Emphasis in original; internal quotation marks omit-

ted.) *State* v. *Castillo*, 165 Conn. App. 703, 713–14, 140 A.3d 301 (2016), aff'd, 329 Conn. 311, 186 A.3d 672 (2018).

"A person is in custody only if, in view of all the surrounding circumstances, a reasonable person would have believed he was not free to leave. . . . The ultimate inquiry [therefore] is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." (Internal quotation marks omitted.) *State* v. *Richard S.*, 143 Conn. App. 596, 614, 70 A.3d 1110, cert. denied, 310 Conn. 912, 76 A.3d 628 (2013).

"Among the factors that a court may consider in determining whether a suspect was in custody for purposes of *Miranda*, are the following: (1) the nature, extent and duration of the questioning; (2) whether the suspect was handcuffed or otherwise physically restrained; (3) whether officers explained that the suspect was free to leave or not under arrest; (4) who initiated the encounter; (5) the location of the interview; (6) the length of the detention; (7) the number of officers in the immediate vicinity of the questioning; (8) whether the officers were armed; (9) whether the officers displayed their weapons or used force of any other kind before or during questioning; and (10) the degree to which the suspect was isolated from friends, family and the public." (Internal quotation marks omitted.) *State* v. *Castillo*, supra, 165 Conn. App. 715. "The defendant bears the burden of proving custodial interrogation." (Internal quotation marks omitted.) Id., 716.

We conclude that, in light of the court's subordinate findings and the testimony provided at the evidentiary hearing, it was reasonable for the trial court to conclude that the defendant was not in custody for purposes of *Miranda* when she was questioned by Tackacs and McKeon at her home. After a careful review of the record, there is scant evidence suggesting that the defendant was questioned in a manner that amounted to a custodial interrogation. The court found that throughout the encounter, the defendant was in her home, free to move about, and at no point restrained. Tackacs and McKeon, both dressed in plain clothes, were invited into the defendant's home after she agreed to respond to questions about Beliveau's complaint. Although there is a dispute as to who asked D to leave, the defendant continued to engage in small talk with the detectives in her kitchen as she put away her groceries. There were no threats of arrest at any point during the encounter, which lasted no more than one hour, and the defendant remained in the home after the detectives left. Simply because the defendant was a suspect at the time of the encounter does not transform it into a custodial interrogation. See *State* v. *Turner*, 267 Conn. 414, 440, 838 A.2d 947, cert. denied, 543 U.S. 809, 125 S. Ct. 36, 160 L. Ed. 2d 12 (2004). We therefore conclude

that no reasonable person in the defendant's position would have felt that she was in custody for purposes of *Miranda*.

The judgment is reversed only as to the conviction of burglary in the third degree and the case is remanded with direction to render a judgment of acquittal on that charge and for resentencing according to law; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] For clarity, in this opinion we refer to Eleanor Beliveau as the victim, and to her son, Ronald Beliveau, as Beliveau.

[3] As we understand its argument, the state would have this court rule that *any* larceny committed by a person who is lawfully permitted to be in a building would constitute a felony, irrespective of the manner in which the underlying crime was committed. For instance, a person who takes an unattended $100 bill during a friend's dinner party would mean that her license would have been implicitly revoked by operation of law, and she would therefore be subject to felony prosecution. We decline the state's invitation. To hold otherwise would enlarge the crime of burglary to an untenable degree.

[4] As many of these cases have noted, the rationale of the burglary statute concerning likelihood of terror "does not mean . . . that an initial lawful entry followed by an unlawful remaining would be excused. For example, A enters an office building during business hours—a lawful entry since the building is open to the public—and remains, perhaps hidden, after the building is closed with intent to steal. A is guilty of burglary." (Internal quotation marks omitted.) *State* v. *Morocho*, supra, 93 Conn. App. 218–19; see *State* v. *Allen*, supra, 216 Conn. 384 (analyzing purposes of revised burglary statutes); *State* v. *Thomas*, 210 Conn. 199, 207–208, 554 A.2d 1048 (1989) (same). It is undisputed in the present case, however, that the conduct at issue occurred during a time at which the defendant was properly within the victim's residence, as evidenced by the insurance documentation Beliveau submitted to the victim's insurance provider.

[5] See *State* v. *Berthiaume*, 171 Conn. App. 436, 447–48, 157 A.3d 681 (defendant unlawfully remained in victim's home after physically attacking victim), cert. denied, 325 Conn. 926, 169 A.3d 231, cert. denied,      U.S.     , 138 S. Ct. 403, 199 L. Ed. 2d 296 (2017); *State* v. *Stagnitta*, supra, 74 Conn. App. 615–16 (defendant remained unlawfully in his place of employment after displaying large knife and demanding money from his superior, thus satisfying "terror element"); *State* v. *Gelormino*, 24 Conn. App. 563, 571–72, 590 A.2d 480, (even if victim's implicit consent allowed defendant onto premises, that privilege was extinguished upon his vicious assault on victim), cert. denied, 219 Conn. 911, 593 A.2d 136 (1991).

[6] In *State* v. *Bharrat*, supra, 129 Conn. App. 26, the court relied solely on *Allen* for this proposition. On closer reading, the court in *Allen* simply reiterated the analysis set out in *Grant*, outlining the differences between "privilege" and "license" within the context of property law. See *State* v. *Allen*, supra, 216 Conn. 380, quoting *State* v. *Grant*, supra, 6 Conn. App. 29–30. In particular, this court in *Grant* noted that unlike a privilege, a license "is exercisable only within the scope of the consent given." *State* v. *Grant*, supra, 6 Conn. App. 29–30. In contrast, "licensed or privileged" as used in our burglary statutes was meant "as a unitary phrase, rather than as a reference to [these] two separate concepts." Id., 30. Therefore, it seems more plausible that the "scope of consent" theory was specific to the distinct concept of a license, and not necessarily the "unitary" concept of "licensed or privileged." Although we have declined to extend the "scope of consent" theory for abrogating a license or privilege as applied to the facts in this case, we do not reach whether this theory is well-founded.

[7] The state argues in the alternative that "[e]ven if some level of terror is necessary, it is difficult to imagine a more terrifying event for such a victim to have a trusted employee steal from her home while the victim was admitted to a medical facility." Although we do not diminish the seriousness of the defendant's crime of stealing from an elderly person's unattended home that she was entrusted to maintain, surely her conduct does not rise to the level of stabbing a victim in his sleep; *State* v. *Bharrat*, supra, 129

Conn. App. 3–4, 20; pointing a gun at a victim; *State* v. *Reyes*, supra, 19 Conn. App. 192–93; or sexually assaulting a victim in the middle of the night. *State* v. *Morocho*, supra, 93 Conn. App. 218–19.

[8] On appeal, the defendant also claims that the court improperly instructed the jury that her larcenous conduct exceeded the scope of her privilege and constituted an implicit revocation of her status as a licensee. Because we agree with the defendant that the evidence was insufficient to sustain her burglary conviction, we need not address that issue.

[9] Because there were only two seats available at the defendant's kitchen table, McKeon remained standing to allow the defendant to sit down with Tackacs.

---